(No. 55660.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MURRAY HOOPER, Appellant.

*Opinion filed December 7, 1989.—Rehearing denied April 9, 1990.*

472

476

CALVO, J., took no part.

James J. Doherty and Randolph N. Stone, Public Defenders, of Chicago (Aaron L. Meyers, Assistant Public

Defender, of counsel, and Barton Evins, law student), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert and Terence M. Madsen, Assistant Attorneys General, of Chicago, and Joan S. Cherry, James S. Veldman and Inge Fryklund, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Murray Hooper, was indicted with Roger Collins and William Bracey for the armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2), aggravated kidnapping (Ill. Rev. Stat. 1979, ch. 38, par. 10—2(a)(3)), and murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)) of Frederick Lacey, R.C. Pettigrew and Richard Holliman. Collins and Bracey were tried and convicted separately, and this court affirmed their convictions and sentences of death. (*People v. Collins* (1985), 106 Ill. 2d 237.) The defendant was found guilty of each offense following a jury trial in the circuit court of Cook County. After a hearing on the question of the imposition of the death penalty (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)), the jury found that there were no mitigating factors sufficient to preclude a sentence of death on the murder convictions. The trial court sentenced the defendant to death. The trial court also sentenced the defendant to concurrent terms of 60 years for each of three counts of armed robbery and 60 years for each of three counts of aggravated kidnapping. The sentence of death was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court under Rule 603 (107 Ill. 2d R. 603).

On the morning of November 13, 1980, Frederick Lacey, R.C. Pettigrew and Richard Holliman were found dead from gunshot wounds under a viaduct at Roosevelt

Road and Clark Street in Chicago. Holliman was found in the back seat of a red Oldsmobile, his hands bound, and with three bullet wounds in the chest and one in the back of the neck. Lacey, who was found lying on the ground outside the driver's side of the automobile, had been shot in the back of the head. Pettigrew was lying under the front bumper with rope and cloth tied around his wrists. He had bullet wounds in the face, chest and leg, and four shotgun wounds in his back.

Morris Nellum, who confessed to taking part in the crimes, testified to the following events. Nellum was with his girlfriend, Regina Parker, at her apartment at 2222 South State Street. At about 9:30 p.m., Roger Collins came to the apartment and spoke with Nellum. Nellum then went to apartment 206 at 2240 South State Street, where he observed Collins, the defendant, William Bracey and three other men he did not know. Two of these men, later identified as Pettigrew and Holliman, were lying on a bed in the rear bedroom with their hands tied behind them. The third, later identified as Lacey, was standing next to the bed. Collins gave Nellum the keys to a brown Cadillac which was parked in the rear lot of the building. Nellum proceeded to the car and was followed shortly by Collins, Bracey, the defendant and the three other men. Collins and the defendant shoved the three victims into the rear seat of a red Oldsmobile, and then entered the front seat, with Collins in the driver's seat. Bracey went to his own car, which was parked nearby. When the red Oldsmobile pulled away, Bracey followed in his car. After waiting a few minutes, Nellum drove to Clark Street and Roosevelt Road. As he approached the viaduct, he saw the red Oldsmobile and Bracey's car and heard shots. Nellum saw Bracey put a shotgun in his car and observed the defendant and Bracey drive away. Collins got into the brown Cadillac driven by Nellum, and Nellum drove back to the parking

lot at 2240 South State Street. There Bracey gave Nellum $125. Nellum then drove Collins to Lake Michigan at 31st Street, where Collins threw two handguns into the lake. Nellum identified the weapons thrown into the lake as a .38-caliber Charter Arms revolver and a .357 Magnum revolver. He identified the .38-caliber revolver as the gun he had seen Bracey give to the defendant at apartment 206 in October 1980. He also identified a photograph he had taken of Collins and the defendant in October 1980. According to Nellum, the photograph showed the defendant holding in his hand the same .38-caliber revolver.

Nellum testified that on February 21, 1981, he was arrested and brought to the police station at 51st and Wentworth Avenue. As he sat in the interrogation room, he heard the defendant in the next room asking to talk to him. He was brought to the room, where the defendant told him in the presence of officers that "Bracey had told them everything," that he [the defendant] was "already buried," and that Nellum should "save" himself. Nellum stated that he had reached an agreement with the State under which he would not be charged with murder or be sent to prison, but would receive a three-year sentence of protective custody and have his family relocated.

On cross-examination, Nellum said that following his arrest he had denied any knowledge of the whereabouts of the weapons because he was afraid. He stated that although he lied to police initially about the weapons, that was the only time he lied and that he was not lying at trial.

Daretha Redmond testified that on November 12, 1980, she was living in a first-floor apartment at 2240 South State Street. Between 10 p.m. and 10:30 p.m., she observed a group of men pass her living room window in a lighted area adjacent to her building. She saw that the

man leading the group was wearing a wide-brimmed "Mexican" hat, and that two of the men appeared to have their hands tied behind their backs. One month later she was shown over 40 photographs by police officers, including one of the defendant. She said the defendant resembled one of the men in the group that had passed her window. When Redmond was shown a picture of Collins, she said he resembled the man wearing the wide-brimmed hat. She also stated that she had seen the defendant and Collins together in the vicinity of the building on other occasions. On cross-examination, she stated that she could not positively identify any of the men in the group she had seen in her neighborhood. On redirect examination, however, she again testified that the photographs she had identified resembled men she had seen that night.

Detective David O'Callaghan testified that a month after the murders he showed photographs to Daretha Redmond, and later recovered evidence from apartment 206 at 2240 South State Street. Sergeant Michael Hoke testified that he arrested William Bracey at 1148 West 51st Street shortly before midnight on February 20, 1981. Bracey gave him a telephone number where he said the defendant could be reached. The number was registered to an apartment at 1354 North Sedgwick in Chicago. Hoke, along with Officers Steed, Griffin, Oravetz and Contino, went to the apartment, but the defendant was not there. However, the officers observed a telephone number on the wall that they speculated might be the defendant's. This number was traced by Sergeant Hoke and the other officers to a building at 1848 North Winnebago, where they were joined by Detective O'Callaghan. O'Callaghan then went to a public phone on the street and dialed the number. The defendant answered and identified himself. Officers at the building were able to hear the phone ringing in the

apartment on the first floor. O'Callaghan returned and knocked on the door of the apartment and announced that it was the police. The defendant opened the door and said, "You got me now. Be cool. Be cool." He unlocked a burglar gate, and the police entered and told him that he was under arrest. He was wearing only undershorts and was told to get dressed. He said, "my clothes are in the back and there are some guns back there." The officers recovered a .32-caliber revolver and a shotgun from the room.

The defendant was handcuffed and taken to a squad car, where his *Miranda* rights were read to him. He indicated his understanding, and said, "You got me now. I am going to tell you everything." He asked who else the police had in custody, and O'Callaghan told him that they had Bracey. Upon learning this, he become angry, and said, "I know that's how you found me. Bracey freaked on me. He told you where I was at." When asked if he was referring to the murders under the viaduct, the defendant said, "I know what you are talking about." He directed the police to a building at 22nd and State, where Nellum was taken into custody. Both Nellum and the defendant were taken to the station, where they were placed in separate interrogation rooms.

Again the defendant was read his *Miranda* rights, and he again said that he would tell "everything." He said that he went to apartment 206 at 2240 South State and saw Collins, Bracey, Nellum and Lacey there, along with two men he did not know whose hands were bound. The defendant told O'Callaghan that he knew that it was to be a "rip-off" and he wanted to get a "piece of the action." He said that he learned from Collins that the victims had come to buy narcotics, but it was decided that they would be robbed. The defendant said that they left the apartment and that he and Nellum drove to the viaduct in the brown Cadillac, while Collins and Bracey

drove in the red Oldsmobile with the three victims. He said that Nellum and Collins had .38-caliber revolvers and that Bracey had a shotgun. He first said that he remained in the car when Collins, Bracey and Nellum began shooting. When questioned on this account, however, he said that he shot "the guy by the right front wheel," apparently R.C. Pettigrew, with a .32-caliber pistol. At this point O'Callaghan left the room to talk to Nellum. The defendant asked to talk to Nellum, and O'Callaghan brought Nellum to see the defendant. O'Callaghan corroborated Nellum's testimony that the defendant told Nellum "I am buried *** save yourself. You tell them everything." After he spoke to Nellum, O'Callaghan told the defendant that there was no evidence of a .32-caliber pistol having been used. The defendant then admitted that he was given a .38-caliber revolver by Collins, and that he "shot into the back seat of the car at the guy in the back," presumably Holliman.

That morning, Lawrence Hyman, an assistant State's Attorney, spoke with the defendant at the station. The defendant related essentially the same story to Hyman as he had to O'Callaghan, except that he said that he and Bracey drove in the Cadillac, and that Collins, Nellum and the victims drove in another car. The defendant added that Bracey fired the shotgun at the victims and that he was given a gun by Collins with which he shot the victim in the back seat of the car.

Firearms expert Burt Nielson of the Chicago police department testified regarding his examination of the weapons recovered from Lake Michigan and the bullets and bullet fragments taken from the victims. He said that the .38-caliber Charter Arms revolver would mark a shell with eight lands and grooves, inclined to the right, and that the .357 Magnum revolver would mark a bullet with five lands and grooves, inclined to the right. All of the bullets and bullet fragments recovered from the vic-

tims exhibited one of these two class characteristics. Bullets with the class characteristics of the .38-caliber revolver were recovered from victims Holliman and Pettigrew. Because of the rusty condition of the recovered weapons, however, Nielson could not say with certainty that the bullets taken from the victims had been fired from the weapons recovered from the lake.

The defendant testified that at 5:30 a.m. on February 21, 1981, he was at the apartment of Patricia Young, 1848 North Winnebago, when the police knocked on the door and said they had a warrant for his arrest. He said that he opened the door and let the officers in, but he denied telling them of the guns in the bedroom. In fact, he denied any knowledge of the weapons. The defendant said that once he was in the squad car, he was beaten by Officers O'Callaghan and Hoke. He said that he was then taken to a viaduct where he was taken from the car, knocked down and questioned with a shotgun to his head. The defendant stated that his right leg was twisted, causing sharp pain. He said that he was then returned to the car. He asked to be taken to a hospital but this was not done. The officers told him they "wanted" Roger Collins, and that "if I cared anything about myself or my family I better had cooperate with them." He said that the officers took him to the parking lot at 2240 South State Street, stayed there for 10 minutes, and then brought him to the police station. He stated that at the station, he requested an attorney and medical attention but that the requests were denied. He said that the statement he gave to the State's Attorney was what O'Callaghan had told him to say.

When cross-examined, the defendant said that he had known Collins for 20 years and had met Bracey while at Stateville penitentiary about a year before November 12, 1981. He said that Officer Hoke had struck·him in the forehead upon his arrest but admitted that a photograph

taken at the time showed no bruise or mark. He denied telling Harry Robertson, a physician's assistant at the Cook County jail, that the wound on his leg was received three or four days before his arrest. He admitted that he did not complain to Assistant State's Attorney Hyman of being mistreated by the police. He said that he did not recall where he was on the night of the murders.

Dr. Anita Shorter testified for the defense that on February 23, 1981, she treated the defendant for an infected cut on his right ankle. On cross-examination, she stated that the wound might have been on the left leg, and that the injury could have been received anywhere from two to three days to a week before.

Harry Robertson, the physician's assistant at the jail, was called as a rebuttal witness for the State. He identified his report of February 23, 1981, in which he stated that he had been told by the defendant that his leg wound was sustained about a week earlier. His report also noted that the wound was on the defendant's left leg. He testified that if the defendant had told him that the injury was inflicted by the police, he would have included that in his report.

### The Conviction and Sentencing Issues

The defendant first argues that the motion to suppress evidence, including statements taken upon his arrest, should have been granted because the arrest warrants outstanding at the time of arrest lacked probable cause on their face. At the time of his arrest, there was a complaint and outstanding arrest warrant in the circuit court of Cook County charging the defendant with the murder of Clorita Ladd. In addition, there was an Arizona complaint and warrant charging him and William Bracey with first-degree murder, and with attempted first-degree murder, kidnapping, armed robbery and burglary. The Cook County complaint later was dismissed at

a preliminary hearing for lack of probable cause because the complaining witness failed to appear. The defendant argues that both arrest warrants were invalid on their face because the complaints failed to specify facts that could support a finding of probable cause. The defendant, however, misconstrues the requirements of the concerned Illinois statute. The requirements for arrest warrants are set out in section 107—9 of the Code of Criminal Procedure of 1963, which provides:

"(a) When a complaint is presented to a court charging that an offense has been committed it shall examine upon oath or affirmation the complainant or any witnesses.

(b) The complaint shall be in writing and shall:

(1) State the name of the accused ***;

(2) State the offense with which the accused is charged;

(3) State the time and place of the offense as definitely as can be done by the complainant; and

(4) Be subscribed and sworn to by the complainant.

(c) A warrant shall be issued by the court for the arrest of the person complained against if it appears from the contents of the complaint and the examination of the complainant or other witness, if any, that the person against whom the complaint was made has committed an offense." (Ill. Rev. Stat. 1981, ch. 38, par. 107—9.)

Section 107—9 does not require that the complaint or warrant articulate the probable cause but rather that the court, in making a determination of probable cause for the issuance of an arrest warrant, examine the complainant or any witness under oath. "Therefore, in issuing the arrest warrant the judge is not bound by the four corners of the complaint, but may base a determination of probable cause upon his required examination of the complainant or witnesses." (*People v. Collins* (1979), 70 Ill. App. 3d 413, 423.) Here, the trial judge that issued

the warrant attested that, "I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same." The defendant does not allege that the trial court judge failed to examine the complainant or that the issuance of the warrant was based only on the statements in the complaint. The Cook County case was not dismissed because of any defect in the warrant, but because, it appears, the complaining witness did not appear at the preliminary hearing.

The defendant contends that the prosecutor made numerous inflammatory statements during closing argument that require reversal of his conviction. The evidence had shown that at the time of the defendant's arrest a shotgun was recovered. The prosecutor began closing argument by attacking various parts of the defendant's story. In doing so, he commented that it was absurd that the defendant could deny any knowledge of the shotgun and .32-caliber pistol found in the bedroom of the apartment where he was arrested. The prosecutor never argued or insinuated that the shotgun found there was used in the murders. He left the subject and went on to attack other parts of the defendant's story. Defense counsel, in closing argument, commented that the shotgun was not introduced into evidence, and was a "red herring." These comments were part of a larger argument in which the defense contended that the State's case was designed to have the jury "ignore the physical evidence and the other evidence and let [the jury's] emotions take over." Replying, the prosecutor stated:

> "The shotgun that he talks about, the .32-caliber, you'll hear about that later, ladies and gentlemen. I can't go into that now, you will hear about the shotgun, I can't go into it now."

The remark was objected to, and the court sustained the objection, stating, "Objection sustained. Do not talk

about anything that you can't go into now." The defendant argues that the prosecution's comment was reversible error, and that the court's statement in sustaining the objection only increased the harm. The prosecution's statement, however, was error invited by the defense argument that the shotgun was mentioned to mislead the jury. (*People v. Collins* (1985), 106 Ill. 2d 237, 277; *People v. Lyles* (1985), 106 Ill. 2d 373, 390; *People v. Vriner* (1978), 74 Ill. 2d 329, 344.) Too, the objection was sustained by the court, and the prosecutor was instructed not to go into the subject. The court did not expressly instruct the jury to disregard the comment, but it was made apparent to the jury by the court that the remark was improper. The defendant did not request such an instruction and did not ask for a mistrial. The defendant cannot take comfort in his citation of *People v. Emerson* (1983), 97 Ill. 2d 487. There, a motion to prohibit the State from bringing out that the defendant was in possession of a gun at the time of his arrest was allowed. The prosecutor stated in his closing:

"Well, ladies and gentlemen, we can't tell you everything he did after his arrest and he knows it. Maybe when this is over I will tell you what he did when he was arrested."

This court held that it was error "to suggest that evidence of guilt existed which, because of the defendant's objection, cannot be brought before the jury. *** [T]he inference that defendant had been guilty of improper conduct at the time of the arrest left the jury free to speculate as to the nature of that misconduct." (*People v. Emerson* (1983), 97 Ill. 2d 487, 497.) Here, the jury already knew that the weapons were found at the time the defendant was arrested. We consider that the reference had no significant effect upon the jury.

The defendant argues that it was error for the prosecutor to say that the defendant's story that he was told he would be used as a witness against Collins and was

coerced into confessing was a "ridiculous, absurd, obscene, defense." We consider this not an observation on the integrity of the defendant's attorney but a comment on the merit, likelihood and strength of the defense's story.

The defendant complains of the prosecutor's comments regarding the testimony of Daretha Redmond. As stated, this witness testified that she picked out a photograph of the defendant and said he resembled one of the men she observed in the parking lot on the night of the murders. On cross-examination, she answered "yes" to the question whether she simply chose pictures of persons that she had seen around her neighborhood, and did say that the police had asked her to do that. On redirect examination, she admitted that she was testifying only because she had been subpoenaed, and that she did not want to be in attendance at the trial. She also admitted that the defense attorney and the defendant's brother had visited her on the day before the trial. Then she again testified that she had picked the defendant's photograph because he resembled one of the men she had seen the night of the murders. On re-cross-examination, she said that the officers who had visited her carried guns. She also said that she did not feel threatened by the visit of the defendant's brother and the defense attorney. In his closing argument, defense counsel argued that the police had coerced Redmond to pick out pictures of persons she knew from her neighborhood. In the prosecutor's rebuttal, he said:

> "That's a gutsy lady, ladies and gentlemen, that is a lady that didn't want to be here, didn't like to be here, didn't like getting visited the day before she came to testify for me by this guy—
>
> DEFENSE COUNSEL: Objection. She didn't say that.
>
> THE COURT: Well, we will rely on the jury's recollection.

PROSECUTOR: Do you think that Daretha Redmond liked that little visit the Hooper family and Hooper's lawyer paid her? And didn't she tell you she gave O'Callaghan a picture of a man who resembled the person outside, didn't she testify to that? That is why we put her on the stand."

The defendant maintains that the prosecutor improperly argued that the defense counsel and the defendant's brother intimidated witness Daretha Redmond. The defense counsel, however, had implied that the police had intimidated Redmond; he made the point in his examination of Redmond that the police who visited her had carried guns, which is, of course, what police are expected to do. The prosecutor, in response, said that he doubted that Redmond was pleased to be visited by defense counsel and Hooper's brother. The court instructed the jury to rely on the witness' testimony, and we consider that, under the circumstances, no error was committed. The credibility of a witness is for the jury to determine.

The defendant cites instances in which he says the prosecutor attacked the integrity of the defense counsel and injected his own integrity and personal assurances in persuading the jury. The defense counsel had argued in closing that William Bracey and the defendant were "virtually indistinguishable" in appearance. The prosecutor attacked that characterization, saying that "you think that maybe [defense counsel] just is misstating something for Mr. Hooper, who is a killer." In context, it is clear that this was not a personal attack, but a criticism of the defense counsel's characterization of the evidence. In response to defense counsel's argument that Officer O'Callaghan had abused the defendant, the prosecutor said, "Dave O'Callaghan, ten years on the job, he's got to come in here and be humiliated and demeaned by [defense counsel]?" It was clear to the jury that the statement was argument responding to the

defendant's accusation of police brutality, which the officers had denied. Similarly, the defendant's complaint that the prosecutor accused the defense counsel of "twisting" the evidence and "trying to hoodwink" the jury, when read in the context of what the prosecutor was responding to, were comments on the evidence and the defense counsel's characterization of the evidence.

The defendant complains of a comment that the prosecutor made regarding Dr. Shorter's testimony. She had testified that she treated a wound on the defendant's right leg. On cross-examination she stated that "it could have been his left leg." The State's rebuttal witness, Harry Robertson, testified that he prepared a report stating that the injury was on the defendant's left leg. The prosecutor in argument later remarked, "Do you think maybe [defense counsel] talked to Dr. Shorter and said he's got a scar on his right leg." The court sustained an objection to the comment, stating, "I don't know what the inference is, but no inference can be drawn." The prosecutor's comment was ambiguous, and the court acted to dispel any improper inference. The jury was instructed that attorneys have the right to interview witnesses, and the jury was repeatedly instructed by the court to act only on the testimony of the witnesses.

The defendant complains of the prosecutor's comment regarding the defendant's claim that he was promised he would be the "star witness" in the trial of Roger Collins. He stated:

> "that I *** I, as one of the prosecutors in charge of this case *** would use Murray Hooper, a man who tells the police and the assistant State's Attorney, Larry Hyman, first, that he shot a guy on the passenger side on the ground, and then he changed and said he shot a guy in the back seat.

That we would use him, a confessed killer, as the star witness in a case against Roger Collins—let me assure you, ladies and gentlemen, we never promised him anything. We never will, we won't have to."

Read in the context of the prosecutor's closing argument, the assistant State's Attorney was not, as defendant argues, personally assuring the jury that the defendant was lying. He was attacking the credibility of the defendant's story that he would be given the role of the star witness in exchange for confessing to one of the killings. It was clear to the jury that Assistant State's Attorney Hyman testified to the defendant's confession and the lack of any promises, and that the prosecutor was not giving testimony during his closing argument; rather he was commenting on the believability of the defendant's story. The jury was instructed that closing arguments are not evidence. Too, the prosecutor's remarks about the testimony of Morris Nellum, Harry Robertson, David O'Callaghan and Larry Hyman were not personal assurances that they were testifying truthfully, but argument on the absence of motives for them to testify falsely and the unlikelihood of a conspiracy to falsely accuse the defendant.

The defendant complains that there were several prosecutorial comments not based on the evidence, but they were not objected to and will not be considered. (*People v. Collins* (1985), 106 Ill. 2d 237, 275; *People v. Carlson* (1980), 79 Ill. 2d 564, 577.) The defendant did, however, object to this comment in argument: "Stateville, that is where Bracey and Hooper hooked up, and from there they continued their life of crime in our cities." That the defendant and Bracey met in Stateville penitentiary was in the record, as was the defendant's extensive criminal record. The comment was based on evidence in the record.

The defendant's last complaint of prosecutorial misconduct is that the State improperly referred to evidence of an inadmissible prior consistent statement of Nellum in order to bolster his testimony. During Nellum's testimony, he identified the transcript of the tape-recorded statement he made to police on February 21, 1981, and his signature on the transcript. The defense did not object to the identification of the transcript. The contents of the statement were not revealed, and the transcript was not given to the jury. The defendant did not seek to impeach Nellum by use of the transcript. The prosecutor, in his argument, stated that Nellum was shown to have lied only about the guns, which falsehood has been described above. The prosecutor went on to say that Nellum's tape-recorded statement and his grand jury testimony were not inconsistent with his testimony at trial. At this point the defendant objected. The court overruled the objection, but the prosecutor did not return to the subject of consistency. We do not consider that under the evidence there was significant error or prejudice to the defendant. The jury was aware that Nellum had made a tape-recorded statement to the police following his arrest, and that he had appeared before a grand jury the following day. Too, the jury knew that he admitted to lying about the guns, and that he had not been impeached by any prior contradictory statements. From that the jurors might already have inferred that Nellum's prior statements were not inconsistent with his trial testimony. For the prosecutor to say directly that Nellum's tape-recorded statement and grand jury testimony were not "inconsistent" with his testimony at the trial was improper, but, on the record, we judge that the prosecutor's comment did not result in prejudice to the defendant.

The defendant also complains that the prosecutor, in referring to Nellum's prior statement, erroneously stated

that "not once in these thirteen pages did you hear him [Nellum] ever say anybody but Hooper, Collins and Bracey were the shooters." The defendant says that Nellum did not say in the statement that he actually saw the defendant shoot anyone. However, the defendant did not object to this statement of the prosecutor, and review of the statement has been waived. (*People v. Collins* (1985), 106 Ill. 2d 237, 275; *People v. Carlson* (1980), 79 Ill. 2d 564, 577.) In any event, it seems that the statement should be interpreted to mean that Nellum never implicated anyone other than Collins, Bracey and the defendant. Nellum never testified at trial that he actually saw the defendant shoot anyone. While these comments of the prosecution relative to the statement and grand jury testimony should not have been made, we consider on this record they did not result in substantial prejudice to the accused. *People v. Caballero* (1989), 126 Ill. 2d 248, 273; *People v. Baptist* (1979), 76 Ill. 2d 19, 29; see also *People v. Skorusa* (1973), 55 Ill. 2d 577, 585.

The defendant next argues that the questioning of witness Morris Nellum by the trial court amounted to an abandonment of a judicially neutral position and served to "rehabilitate" the witness' credibility. On cross-examination, Nellum stated that he had lied to police initially about his knowledge of where the guns were located. On redirect examination, he stated that he lied only to the police about the guns, and had not lied at trial or before the grand jury. On re-cross-examination, Nellum answered "yes" to the question of whether every time it had been necessary to lie to save himself, he had done so. On further redirect examination, he stated that he had lied only about the guns. On further cross-examination, he denied that everything he had testified to at trial was false. At this point, the trial court addressed the witness:

"Q. Mr. Nellum, when you say every time it is necessary for you to lie in this case, you have lied, what do you mean by that?

A. Well, there were questions they questioned me about. I lied about where the guns was thrown. I didn't want them to think I wouldn't lie, because I have. You know, anybody would.

Q. About the guns.

A. Yes, I did lie about—

Q. When you were first asked?

A. Yes, I did lie about the guns.

Q. Well, did you lie about anything else?

A. No, sir.

Q. Oh, well, all right. All right."

After the taking of testimony was completed, the defendant moved for a mistrial, but the motion was denied. "It is clear that a trial judge has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure." (*People v. Palmer* (1963), 27 Ill. 2d 311, 314; see also *People v. Nevitt* (1988), 174 Ill. App. 3d 326, 341; *People v. Bradley* (1984), 128 Ill. App. 3d 372, 382.) Here, the court asked questions to clarify what it perceived to be confusion as to what Nellum admitted to lying about. In doing so, we consider that the court did not exceed the limits of impartiality or prejudice the defendant in any way. *People v. Santucci* (1962), 24 Ill. 2d 93, does not support the defendant's claim. There the court interrogated every witness at length and emphasized the testimony which pointed to the defendant's guilt.

The defendant contends that the trial judge improperly admitted hearsay testimony, and in overruling the defendant's objection, expressed his "personal belief" that the defendant was in the apartment at 2240 South State Street (with Bracey) as Nellum had testified. Even if the testimony of Nellum that the defendant had requested a gun from Bracey and had been assured he

would obtain one is regarded as hearsay, there was no prejudice to the defendant. The connection of the defendant with the weapon was established by other evidence.

Nellum testified that he saw Bracey give the defendant a .38-caliber revolver in October 1980, at the same apartment. Nellum identified the .38-caliber revolver recovered from Lake Michigan as the gun the defendant received from Bracey. He also identified the same revolver in a picture he took that showed the defendant holding the revolver. The defendant's link to this gun was established through proper testimony, and if the court erred, it did not prejudice the defendant. And the judge did not, as the defendant claims, express a personal belief that the defendant was present in the apartment that night. The judge remarked "the defendant was present" in the context of ruling on the hearsay objection. Nellum testified that the defendant was present in the apartment. The court ruled on the objection according to the scene the witness had described, and it obviously was not referring to the credibility of the witness' testimony.

The defendant contends that his confessions should have been suppressed because of evidence that he was injured while in custody. It is, of course, for the trial court to judge the voluntariness of a confession and, thus, its admissibility. (*People v. Britz* (1986), 112 Ill. 2d 314, 319-20; *People v. Kincaid* (1981), 87 Ill. 2d 107, 119.) The voluntariness of a confession depends upon whether it has been made freely, voluntarily and without compulsion or whether the accused's will was overborne at the time he confessed. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 116-17; *People v. Hester* (1968), 39 Ill. 2d 489, 497.) Certainly, a confession obtained by use of force or brutality is inadmissible, and this court has held that where it is "conceded or clearly established" that

the defendant received injuries while in police custody, the burden is on the State to establish by clear and convincing evidence the cause of the defendant's injury. (*People v. Wilson* (1987), 116 Ill. 2d 29, 40; *People v. Davis* (1966), 35 Ill. 2d 202, 206; *People v. La Frana* (1954), 4 Ill. 2d 261, 267; *People v. Thomlison* (1948), 400 Ill. 555, 561-62.) The defendant argues that he had shown his injury, and that the State failed to meet its burden of explaining the injury. Here, it was not established that the defendant was injured while in police custody. Marks of the blows to the head that he claims he received were not visible in photographs taken upon his arrest. His general appearance was not that of one who had been thrown to the ground. The infected cut on the inside of defendant's ankle for which he received treatment could have been received, according to testimony, as long as five days before the defendant's arrest. It was also possible that the cut might not have been the same wound as the one on his right leg that he displayed to the jury. We consider that the trial court did not abuse discretion in denying the motion to suppress the confession.

The defendant also says that his confession should be suppressed on the ground that his right to counsel under the sixth amendment of the United States Constitution was violated. (U.S. Const., amend. VI.) As the defendant acknowledges, this question was not raised in the trial court, and it has been waived for purposes of review. *People v. Collins* (1985), 106 Ill. 2d 237, 275; *People v. Carlson* (1980), 79 Ill. 2d 564, 577.

The defendant contends that he was not proven guilty of armed robbery beyond reasonable doubt. It is axiomatic that a court of review will not set aside a criminal conviction unless the evidence is so unsatisfactory that a reasonable doubt of the defendant's guilt is created. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43;

*People v. Brisbon* (1985), 106 Ill. 2d 342, 360; *People v. Vriner* (1978), 74 Ill. 2d 329, 342; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227.) The defendant stated in his confession that it was decided that the victims were to be robbed instead of selling them narcotics, and that he wanted a "piece of the action." He said that he was given $300 by Collins. The defendant also admitted to the possession and use of a gun. Nellum testified that he saw Bracey give the gun to the defendant. Nellum stated that he was given $125 by Bracey upon their return to the parking lot. We have no reasonable doubt regarding the jury's verdict of guilt of armed robbery.

The defendant's contention that he was improperly sentenced to three concurrent terms of 60 years for aggravated kidnapping is correct. As in *People v. Collins* (1985), 106 Ill. 2d 237, 285-86, the aggravated kidnapping was not "for ransom" and thus was punishable only as a Class 1 felony, which carries a maximum sentence of 15 years. (Ill. Rev. Stat. 1983, ch. 38, pars. 10—2(a)(3), 10—2(b)(2), 1005—8—1(a)(4).) Under Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)), we reduce the defendant's sentence for each of the aggravated kidnapping convictions to 15 years.

The defendant also contends that the prosecutor, at the second phase of the death penalty hearing, made improper and severely prejudicial arguments. He says that it was grave error for the prosecutor to argue that if the jurors did not impose the death penalty, they would have lied to the judge and to God. He argued:

"Every one of you on this jury raised your right hand and you swore to your Maker that you would follow the law. You were asked specifically a question by that judge, would you consider the imposition of the death penalty under certain circumstances.

And the reason you twelve people are here today is because you said yes, because you said you would follow

the law, the law of the State of Illinois that's written in our statutes.

If you were truthful and you were being honest when you raised that right hand and swore to do your duty, and when you said, 'Yes, I would consider it under certain circumstances,' what other circumstances are there that could be worse than this?

If this is not the case, what case are you looking for?

We aren't going to have Adolph Hitler in here. We've got a mass murderer who sits in front of you.

\*\*\* [If these are] not the circumstances you were saying that you would consider, then I don't know any that you ever would and you lied to the judge and to all of us here.

\*\*\* And more than us, because we don't count. You lied to Somebody up there because you took an oath just like I took an oath, and I live up to my oath every day that I walk into a courtroom."

The defense attorney objected several times to the argument, but the objections were overruled. The trier of fact, which here was the jury, has the duty to weigh relevant aggravating and mitigating factors and determine whether any mitigating factors are sufficient to preclude the imposition of the death penalty. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d).) The jurors agreed to follow the law, and they were instructed as to the law. The purpose of the prosecutor was, of course, to persuade the jurors that under the evidence this case was an appropriate one for imposition of the death penalty, but he went too far. We consider that to say that the jury would be branded with lying to the judge and lying to God if it did not vote for the death sentence could well have had the effect of diverting the jury's attention from its consideration of the aggravating and mitigating factors. (Cf. *People v. Gacho* (1988), 122 Ill. 2d 221, 257; *People v. Brisbon* (1985), 106 Ill. 2d 342, 367-70; *People v. Szabo* (1983), 94 Ill. 2d 327, 366-67.) The jury has the responsibility of

weighing these factors; the jurors do not "lie" if they find a mitigating factor sufficient to preclude imposition of the death penalty. The State's defense for the comments is that they were invited because the defense attorney "personally begged" the jury not to impose the death penalty. That may explain, but does not justify, the argument.

The defendant complains next of the State's argument at the sentencing hearing:

> "How else do we defend people from people like Murray Hooper? Oh, put them in the penitentiary for life.
>
> What if he kills a guard? ***
>
> What do we do with him then, ladies and gentlemen? Then what do we do with him there? What if he kills a chaplain in the prison?"

The court sustained objections to these remarks, calling them "unnecessary speculations." This court has consistently held that commenting on the possibility of the defendant's obtaining parole in order to persuade the jury to impose the death penalty is improper and prejudicial. (*People v. Gacho* (1988), 122 Ill. 2d 221, 257; *People v. Brisbon* (1985), 106 Ill. 2d 342, 367; *People v. Walker* (1982), 91 Ill. 2d 502, 515.) Similar to speculating on the possible parole of the defendant and the possibility of his committing future crimes if not executed, commenting that the defendant may kill while in prison may cause the jury to focus "upon a speculative possibility that may or may not occur," and that is immaterial to the jury's consideration of aggravating and mitigating factors. (*People v. Walker* (1982), 91 Ill. 2d 502, 515.) Speculating that the defendant, if not executed, might kill a prison guard or chaplain was inflammatory and we consider could not be cured by the court's sustaining of the objection. See *People v. Gacho* (1988), 122 Ill. 2d 221, 259; *People v. Yates* (1983), 98 Ill. 2d 502, 538.

The same improper appeal was later made to the jury by the prosecution:

> "Fill our prisons up with Murray Hoopers, and then the people, the juries of this state, they can be responsible for what happens there.
>
> *** You know, even animals, animals when they are about to be killed fight desperately not to be killed, every human thing does.
>
> He had no respect for anybody's life. Do you want to take a chance? Do any of you want to take the chance in the future?"

Objection to these remarks was overruled.

Considering all of the improper arguments at the sentencing hearing, we hold that the sentence of death must be vacated. (Prior to releasing an opinion announcing *inter alia* the vacatur of the death sentence, the Supreme Court, as stated hereafter, replaced the discrimination test of *Swain* with the *Batson* test. As a result, this court remanded the cause for a hearing under the standard announced in *Batson*.)

### The *Batson* Issue

We turn now to consider defendant's argument that his convictions should be reversed and a new trial ordered on the ground that his right to trial by an impartial jury was violated when the prosecutor exercised peremptory challenges to excuse all five of the black prospective jurors. The record shows that 63 prospective jurors were called and examined and that the State exercised peremptory challenges to exclude 11 potential jurors, 5 of whom were black. During jury selection, the defendant twice objected to the State's excusing the black members of the venire. The trial court, on the basis of *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, overruled the objections.

After the trial of the defendant and while this appeal was pending, the Supreme Court handed down *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The Court in *Batson* held that a prosecutor cannot exercise peremptory challenges to exclude venirepersons solely on account of race and that a defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecution's exercise of peremptory challenges at trial. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) The standard enunciated in *Batson* was to be applied to all cases pending on direct review and not yet final. (*Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708.) The defendant's appeal was before us and is governed by *Batson*. On May 1, 1987, this court, pursuant to its supervisory authority (107 Ill. 2d R. 383), remanded the cause to the trial court for a *Batson* hearing to consider the defendant's charges of discrimination and to determine whether racial motivation in the exercise of peremptory challenges was shown.

If the trial court was to find a *prima facie* showing of discrimination, it was directed to determine whether there were racially neutral explanations for the challenges. On remand, the trial court found that the defendant failed to establish a *prima facie* case of purposeful discrimination in the State's selection of the jury. The circuit court's findings and conclusions are now before us on review.

The question now is whether the trial court erred in finding that the defendant failed to establish a *prima facie* case of racial discrimination in the State's use of its peremptory challenges.

Establishing a *prima facie* case requires the defendant to first show that he is a member of a cognizable racial group and that the State has exercised peremptory

challenges to remove from the venire members of that group. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) This the defendant has done. The defendant is black, and it is undisputed that the prosecutor exercised peremptory challenges to remove black members from the venire. Clearly peremptory challenges constitute a jury-selection practice that permits those to discriminate who are of a mind to discriminate. The defendant must further show that one would infer from these factors and "any other relevant circumstances" that the prosecutor peremptorily challenged venirepersons on account of their race. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723.) The question, therefore, is whether, considering "all relevant circumstances," the defendant has established a *prima facie* case of discrimination.

Under *Batson*, the defendant must demonstrate, based on the totality of the facts and circumstances, a *prima facie* case of purposeful discrimination. As held in *People v. Evans* (1988), 125 Ill. 2d 50, 63-64, and *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, relevant circumstances the trial court may consider in determining whether an inference of discrimination can be drawn include: a "pattern" of excusing black jurors; "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges" (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723); the disproportionate use of peremptory challenges to blacks (*State v. Gilmore* (1986), 103 N.J. 508, 535-36, 511 A.2d 1150, 1164; *People v. Wheeler* (1978), 22 Cal. 3d 263, 274-75, 583 P.2d 748, 760, 148 Cal. Rptr. 890, 901-02); the level of black representation in the venire as compared to the jury (*Batson*, 476 U.S. at 93, 90 L. Ed. 2d at 85, 106 S. Ct. at 1721); whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic (*People v. Wheeler*, 22 Cal. 3d at

280, 583 P.2d at 764, 148 Cal. Rptr. at 905); the race of the defendant and the victim (*Fields v. People* (Colo. 1987), 732 P.2d 1145, 1156; *Commonwealth v. McKendrick* (1986), 356 Pa. Super. 64, 77, 514 A.2d 144, 151; *Commonwealth v. Soares* (1979), 377 Mass. 461, 490-91, 387 N.E.2d 499, 517); and the race of the witnesses (*United States v. Mathews* (7th Cir. 1986), 803 F.2d 325, 332, *rev'd on other grounds* (1988), 485 U.S. 58, 99 L. Ed. 2d 54, 108 S. Ct. 883).

The trial court held that the defendant had not established a *prima facie* case of discrimination. The court stated:

"From the Court's examination of all the available facts and circumstances relevant to the selection of the jury in this case, the Court does not detect or find evidence of a mind to discriminate in the actions or statements of the State. Nor does the Court find a pattern of strikes that would give rise to an inference of discriminatory intent.

The Court does find that the reasons articulated by the State during jury selection, for having exercised its challenges refute any inferences of a discriminatory intent. Neutral, valid and logical reasons were stated as the predicates upon which the challenges were based. Those explanations were not required to rise to the level of a challenge for cause.

The Court rules that the totality of the evidence does not raise an inference that the State used its peremptory challenges to exclude blacks from the jury on the basis of race and a *prima facie* case of purposeful discrimination is not established."

A trial court's determination that a defendant has failed to establish a *prima facie* case of discrimination is a finding of fact and will not be overturned on review unless it is found to be against the manifest weight of the evidence. (*People v. Mack* (1989), 128 Ill. 2d 231, 238; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413.) If

the trial court's account of the evidence is plausible in light of the record viewed in its entirety, this court will not reverse it even though it may be convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. (*Anderson v. City of Bessemer City* (1985), 470 U.S. 564, 573, 84 L. Ed. 2d 518, 528, 105 S. Ct. 1504, 1511.) We conclude that the trial court's determination that the defendant failed to establish a *prima facie* case of discrimination was not against the manifest weight of the evidence.

In *United States v. Grandison* (4th Cir. Sept. 12, 1989), No. 88—5097, the court, upholding the trial court's finding that no *prima facie* case of discrimination was made out, observed that *Batson* noted that a trial judge's findings are findings of fact, and the court said that as such they were entitled to great deference. Especially important was the fact that the judge was intimately familiar with the jury's selection. He had asked questions of the prospective jurors and had observed the parties' use of their challenges. The court's comment in *Grandison* is applicable here.

As stated, at the defendant's sentencing hearing, the State used 11 peremptory challenges, five of which were exercised against black members of the venire. The defendant argues that the State's removal of all of the black members of the venire who remained after challenge for cause indicates a purposeful elimination of blacks. The defendant says that the fact that the prosecutor eliminated all the blacks from the jury by itself creates a *prima facie* case of racial discrimination. This court, however, has decided that in determining whether a defendant has established a *prima facie* showing of purposeful discrimination, the court should consider more than simply the number of jurors excused. (*People v. Young* (1989), 128 Ill. 2d 1, 19 (State excused all four of the black members of the venire); *People v. Mahaffey*

(1989), 128 Ill. 2d 388, 414 (State excused all seven black venirepersons who remained after challenge for cause).) On remand of this cause, several justices, in a special concurrence, stated that "[the court] must avoid arbitrarily deciding the delicate question we now consider solely from the number of blacks peremptorily excused." *People v. Hooper* (1987), 118 Ill. 2d 244, 247-49 (Ryan, J., specially concurring).

Allowing the trial court to find a *prima facie* case based solely on the fact that the State has used its peremptory challenges to exclude all the black jurors from the venire would negate consideration of all other relevant circumstances such as those set out in *Evans* and would be inconsistent with *Batson*'s mandate that all relevant circumstances be considered. Also if a *prima facie* case is made out on the basis that all black venirepersons have been peremptorily challenged, then the trial court would be precluded from applying its observations and judicial experience in deciding whether an inference of discrimination has been raised. This is not to say of course that such a circumstance is not relevant to the trial court's determination of whether a *prima facie* case is established. Removal of all black venirepersons must be considered along with all other relevant circumstances in determining whether a *prima facie* case has been established. *People v. Jones* (1988), 177 Ill. App. 3d 663, 669.

At the *Batson* hearing, the defendant also argued that the only common characteristic among the black members of the venire who were excused was race; that in many cases the amount of information known about a venireperson was insufficient to warrant a decision by the State to excuse the prospective juror and that the black venirepersons excused by the State shared many of the same characteristics as white venirepersons not challenged by the State (for example, the State accepted

a white juror who lived closer to one of the codefendants than a black juror; the State accepted white jurors, but struck black jurors even though all three gave hesitant and unclear responses to questions and the State accepted white jurors who had religious qualms about imposing the death penalty, but struck a black juror who also had such qualms). Counsel also suggests that the State's failure to develop further questions of the challenged black venirepersons demonstrates that the State intended to dismiss all of the black venirepersons without seriously considering them for jury service.

Although not required to do so, the prosecutor, during jury selection, stated reasons for most of his peremptory challenges. The prosecutor did not explain his excusing the first black prospective juror, but he did offer explanations for the other four strikes of black persons on the venire. As to the second black potential juror, the prosecutor explained that he excused him because he was concerned with the man's hesitant and casual demeanor. The prosecutor struck the third potential black juror because she resided in an area frequented by the "Royal Family," a gang to which one of the codefendants belonged. The prosecutor struck a fourth prospective black juror because her brother had been arrested and incarcerated. The other black juror prospect was excused after a tendered panel was changed by the defendant's exercise of his peremptory challenges, the State contends, in order to restore a more gender-balanced jury (the juror had initially been tendered as acceptable to the prosecution). The defendant argues that under the circumstances, the reasons given by the prosecutor were pretextual and enhanced the inference of discrimination. All of the factors given by the prosecutor, the defendant contends, were sufficient to establish a *prima facie* case of discrimination based solely on race and demonstrate that the trial court's decision was clearly erroneous.

The State contends that given all of the relevant circumstances, the trial court's finding that the defendant failed to establish a *prima facie* case of racial discrimination in the State's selection of the jury was not against the manifest weight of the evidence. The State says that while the five black venirepersons were peremptorily challenged, the exercise of challenges was not disproportionate because the State excused more whites than blacks from the venire. The State also notes that the venire, by chance, contained fewer than the usual number of blacks, which limited the range of black prospective jurors. The State notes too that it had several peremptory challenges remaining when it accepted and tendered to the defendant a panel with a black woman (this is the woman excused to restore gender balance to the jury). Too, though not required to do so, the State gave its reasons during jury selection for its challenges. The reasons given, the State contends, show that the challenges were racially neutral. Finally, the State offers the point that there was no racial motivation for excluding black members of the venire because the case was one in which the defendant, the victim, and most of the witnesses were black.

There are circumstances when excusing all potential black jurors who are heterogeneous except as to race will indicate a *prima facie* case of racial discrimination. (*People v. McDonald* (1988), 125 Ill. 2d 182, 198 (prosecutor's exercise of 16 of 18 peremptory challenges to exclude all members of the defendant's race from the venire along with the fact that they shared race as their only common characteristic was sufficient to establish a *prima facie* case).) Here, however, the judge considered other relevant circumstances including statements by the prosecutor during jury selection, which consisted of the reasons for excusing the black venirepersons. (See *People v. Brisbon* (1989), 129 Ill. 2d 200 (where the trial

court considered the prosecutor's reasons in determining whether a *prima facie* case existed); see also *State v. Antwine* (Mo. 1987), 743 S.W.2d 51, 64-66 (where the Missouri Supreme Court held that trial judges should consider prosecutor's explanations as part of the process of determining whether a *prima facie* case of racial discrimination has been established).) While a numerical pattern of strikes can be readily shown, the trial court is in the best position to determine whether the circumstances surrounding such strikes warrant a finding that a *prima facie* case has been established. (*People v. Daniels* (1987), 164 Ill. App. 3d 138, 141.) In the evaluation of the prosecutor's explanations for excusals, the trial judge is especially qualified to make this determination because he or she is familiar, in most instances, with local conditions and prosecutors and can draw upon his or her power of observation and judicial experience. *People v. Evans*, 125 Ill. 2d at 67.

The reasons that the trial judge accepted from the prosecutor as nondiscriminatory and legitimate to meet a charge they were racially motivated excusals have been accepted as valid reasons for the exercise of a peremptory challenge. For example, the prosecutor explained that he excused juror Thomas because her brother had been convicted of a robbery and had been sentenced to prison. Such an explanation has been deemed sufficiently race neutral. (*People v. Parker* (1988), 166 Ill. App. 3d 123, 128.) Challenging a juror based on a hesitant, nonserious and casual demeanor, the reason given for excusing juror Williams, has also been accepted as proper. (*People v. Young* (1989), 128 Ill. 2d 1, 20; *People v. Mack* (1989), 128 Ill. 2d 231, 240.) Juror Miller was excused, the prosecutor contends, because she lived in an area frequented by the gang of which a codefendant was a member. Striking a juror because of geographic proximity to the scene of the crime or to the residence of one

of the codefendants has been accepted as a race-neutral and legitimate reason for excusing a prospective juror. (See *People v. Williams* (1988), 177 Ill. App. 3d 787, 792 (where the court held that "[c]ommon life experience teaches us that gang members often protect one another, and consequently the implication that the jurors' safety might be in question is legitimate").) Finally, juror Austin was excused, the prosecutor stated, to achieve a better gender balance on the jury. Using peremptory challenges to form a more gender-balanced panel is an acceptable, nonracial use of a peremptory challenge. (*United States v. Hamilton* (4th Cir. 1988), 850 F.2d 1038, 1040.) These given reasons were accepted by the trial judge and considered sufficient to reject a finding of *prima facie* discrimination based on his observation of the prosecutor and his knowledge and memory of the actual *voir dire* in this case.

The trial judge also considered that an unusually small number of blacks were called to serve on the venire, and that the crime was not interracial in the sense that the defendant, the victims and the principal witnesses were black. Too, the use of challenges to excuse blacks was not disproportionate in that slightly more whites were excused than blacks. These are factors which may weigh against a *prima facie* finding of discrimination. In *People v. Evans* (1988), 125 Ill. 2d 50, 65, this court held that the State's use of peremptory challenges to excuse blacks was not disproportionate in that the prosecutor excused more whites than nonwhites. Here, the prosecutor excused six white members of the venire with peremptory challenges. We also observed in *Evans* that the racial characteristics, so to speak, of a crime are factors to be importantly considered by the trial court in determining whether a *prima facie* case of discrimination has been established. In *Evans* we held that any racial question arising through the selection of

the jury where the defendant is black, the victim is black and the majority of the witnesses are black is minimal, if not nonexistent. (*People v. Evans*, 125 Ill. 2d at 66.) That a prosecutor had peremptory challenges remaining but did not use them to strike a black venireperson can also indicate an absence of an intent to discriminate. The prosecutor accepted and tendered to the defendant a panel containing a black woman. The prosecutor excused the black woman only after the defendant exercised 10 peremptory challenges, which altered the panel gender. The black woman was excused along with two other women in an attempt, the prosecutor says, to change the gender balance of the panel.

The defendant says that because the prosecutor did not exercise peremptory challenges against white prospective jurors with the same or similar characteristics as black prospects, it must be assumed that the prosecutor's explanations for excusing the black jurors were simply a pretext to hide a racial motivation for the exercise of the challenge. As this court in *People v. Young* (1989), 128 Ill. 2d 1, 23, observed, this argument cannot be lightly dismissed. Simply because a prosecutor rejects a black member of the venire and accepts a characteristically similar white member, however, it does not follow that this itself shows that the prosecutor's explanations were pretextual. As we stated:

> "Though a part of the prosecutor's explanations may have been applicable to white jurors who were not challenged, the white jurors may have, in some other respect, exhibited a trait which the prosecutor reasonably could have believed would make him or her desirable as a juror. *** This question and all others involved in the hearing were for the trial judge, who had also presided at the *voir dire*." *Young*, 128 Ill. 2d at 23.

The trial court found that considering all relevant circumstances it was shown that the prosecutor did not ex-

cuse prospective jurors because of their race. The crucial determination regarding a complaint of intentional discrimination is of course the findings of fact, the making of which is squarely within the province of the trial court. It is usually the hearing court that observes the *voir dire* proceeding and hears the prosecutor's explanations. The hearing judge's decision is entitled to the reviewing court's consideration. This court has reviewed the record and cannot say that the trial court's finding is against the manifest weight of the evidence.

The defendant next argues that the trial judge's finding that the defendant failed to establish a *prima facie* case of discrimination is not entitled to deference here (1) because he did not conduct the hearing according to the requirements of *Batson*; (2) because he manifested a bias against the *Batson* remedy and against the defendant; and (3) because he acted as a prosecutor instead of a neutral magistrate.

The defendant initially accuses the trial judge of failing to follow *Batson* by uncritically accepting the prosecutor's statements without scrutiny or comparison to the entire record. From our review of the record, we find the defendant's contention, in the time honored expression, without merit. The trial judge clearly was aware of the *Batson* requirements and gave careful consideration to the arguments of the parties.

The defendant says that the trial judge demonstrated hostility towards the *Batson* remedy through comments during trial and during the hearing. At the outset of the *Batson* proceedings, the judge commented on difficulties raised by *Batson* and his unhappiness with the decision and his belief that part of the holding was unclear. He never suggested, however, that he would not follow the law as announced. He commented that discrimination had not occurred in his courtroom and that he believed

that discrimination in jury selection was a "non-issue" in the county.

Prior to the hearing, defense counsel had filed a motion in this court for substitution of judges for the *Batson* hearing, claiming concern regarding the judge's impartiality and neutrality on the *Batson* issue. The motion was denied. Prior to the hearing, defense counsel also confronted the trial judge, saying:

> "You have said that you do not think they discriminated because if you did, you would have done something when the case was tried, particularly where you were asked to do so. So it seems to me what you have just told us is that you have already made up your mind on this case, you've already decided the issue."

The judge immediately responded:

> "No, No. I'm waiting to hear what you have to say. I haven't made up my mind at all. I'm waiting to hear what you have to say and you were in the process of doing it."

A judge, of course, should be disqualified from hearing a case where he has prejudged it in favor of one of the parties. (See, *e.g., People v. Robinson* (1974), 18 Ill. App. 3d 804, 808.) The mere expression by a judge of an opinion or the fact that a judge has strong feelings on an issue does not amount to bias or prejudice. There must be active personal animosity, hostility, ill will or distrust towards the defendant. (*People v. Vance* (1979), 76 Ill. 2d 171, 181-82.) In the absence of such a showing, there is not an actual prejudice which would prevent or interfere with a fair hearing. Here, the defendant has not shown actual prejudice. The trial judge's statements indicate no prejudice against the defendant, himself. Instead, the trial judge more than once and inappropriately indicated his attitude toward *Batson* and other subjects. That the judge disagrees with the holding in *Batson*, however, does not mean that he was unwilling or unable to apply it to the case before him. When questioned regarding his

ability to judge the issue fairly, he stated that he had no preconceived idea about discrimination or its absence in this case prior to hearing the argument of counsel. Based on the record, it is apparent that, at the time he made the statements, the judge had not yet made any decision on the merits of the question before him. Although he had strong feeling about *Batson*, he stated he would keep an open mind and would listen to any appropriate argument of counsel. The judge was not disqualified from conducting the *Batson* hearing. The trial court is in the best position to determine whether it has been prejudiced against a defendant and the burden of establishing a judge's prejudice is upon the defendant. (*People v. Hall* (1986), 114 Ill. 2d 376, 406.) What this court observed in *People v. Vance* (1979), 76 Ill. 2d 171, may be cited here:

> "To conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made. It will be viewed by some as reflecting unfavorably upon the judge, and it tends to disrupt the orderly functioning of the judicial system. (*United States v. Valenti* (D.N.J. 1954), 120 F. Supp. 80.) As was said in *Cox v. United States* (8th Cir. 1962), 309 F.2d 614, 619, quoting from *In re J. P. Linahan, Inc.* (2d Cir. 1943), 138 F.2d 650:

>> 'The human mind, even at infancy, is no blank piece of paper. We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are prejudices.'

> Every human is, consciously or subconsciously, partial to some degree in that he is influenced by the habits he has been trained in, the experiences he has had, occupationally or otherwise, the people with whom he associates, the area in which he lives and the innumerable unrecognized factors which subconsciously affect every individual's philosophy. \*\*\* This, however, is nothing more nor

less than one of the characteristics of human nature. The most that ought to be expected is that the judge will recognize that he has basic predilections and make a conscientious effort to set them aside and give dispassionate consideration to the case before him. More than that can scarcely be expected of any individual." *People v. Vance*, 76 Ill. 2d at 179-80.

Finally, the defendant suggests that the trial judge functioned as a prosecutor in that he tended to explain and develop, on several occasions, reasons given by the prosecutor for the exercise of the peremptory challenges. Looking to the entire record, it is simply clear that the trial judge had excellent recall as to the facts and circumstances of the *voir dire*. This strengthens, at least in part, the conclusion that the trial judge's determination should be given deference.

For all of the foregoing reasons, we affirm the decision of the trial court that no *prima facie* case of discrimination has been established. The judgments of conviction and the sentences for robbery and aggravated kidnapping, as amended, are affirmed, and the cause is remanded to the trial court for a new hearing and imposition of sentence on the conviction of murder.

*Judgment affirmed in part
and vacated in part; cause
remanded with directions.*

JUSTICE CALVO took no part in the consideration or decision of this case.