(No. 76490.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. LEONARD KIDD, Appellant.

*Opinion filed December 19, 1996.—Rehearing denied
February 3, 1997.*

McMORROW, J., joined by FREEMAN, J., specially concurring.

HARRISON, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook

County, the defendant, Leonard Kidd, was convicted of four counts of murder, one count of armed robbery, one count of aggravated arson, and four counts of concealment of a homicidal death. At a separate sentencing hearing, the same jury found the defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. The defendant was accordingly sentenced to death for the murder convictions, and he received sentences of imprisonment for the remaining convictions. The defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm the judgment of the circuit court, as modified.

The defendant previously pleaded guilty to these charges and was sentenced to death at that time. In an earlier appeal, this court found the defendant's plea to be defective because of improper admonitions given to the defendant at the plea hearing, and accordingly vacated his convictions and death sentence. *People v. Kidd*, 129 Ill. 2d 432 (1989). The case then proceeded to trial on remand.

The present offenses were discovered on January 12, 1983, when investigators responding to the report of a fire found the bodies of three adults, Renee Coleman, Michelle Jointer, and Ricardo Pedro, and one child, Renee's son Anthony, in an apartment at 1553 West 91st Street in Chicago, where Coleman lived with her son and Jointer. The victims were bound and gagged, and they had been stabbed repeatedly. Two separate fires had been set inside the apartment. Following an investigation, the defendant and his half-brother, Leroy Orange, were taken into custody and charged with these offenses. Their trials were severed at an early stage in the proceedings.

In the proceedings below, the State presented extensive evidence of the defendant's involvement in these crimes. Because the defendant does not challenge the sufficiency of the State's proof of his guilt, only a brief recitation of the trial evidence is necessary here; additional evidence will be summarized as it becomes relevant to the discussion of specific issues. The defendant made a series of statements to police after he was arrested, and these were introduced into evidence at trial. The defendant initially told officers that he and his brother, Leroy Orange, were at Coleman's apartment on the night of the murders. The defendant said, however, that he had left there around 4:30 in the morning, when Orange began arguing with Ricardo Pedro. The defendant explained that he decided to leave when the confrontation turned violent. The defendant said that before he could do so, however, "two dudes" entered the apartment; both of them had knives. The defendant remained outside the building, and he said that he later saw the two men leave; one was wearing a jacket covered with blood. At that time, the defendant gave inconsistent accounts of the identities of the two men he had seen; at one point, the defendant said that one was named "Slick Rick." After the defendant made that statement, police brought Leroy Orange into the room where the defendant was being interrogated. Orange told the defendant that he had already admitted committing the murders and, further, had told authorities that there was no "Slick Rick."

The defendant gave police a second statement later that evening. In the second statement, the defendant said that he was at the Sportsman's Lounge at 79th and Halsted Streets during the evening of January 11, 1983. Around 10:30 Orange and Renee Coleman arrived, and they later took the defendant to the defendant's residence, where the defendant gave them a combination

TV/radio "box." The defendant then returned alone to the Sportsman's Lounge. He went back home some time later, where he received a telephone call from Orange around 12:30 a.m. Orange said that he was having "a problem with a stud," and the defendant then went to Coleman's apartment. The defendant said that Orange and Pedro later began fighting, and Orange stabbed Pedro. The defendant attempted to help Pedro into one of the bedrooms in the apartment. Sometime later, according to the defendant, Orange stabbed Pedro again. Orange also forced Coleman to tie up her son, and Orange bound and gagged Coleman and Jointer and stabbed the victims.

The defendant repeated many of the preceding details in a formal statement he gave several hours later in the presence of a court reporter. While in custody, the defendant also led police to various garbage cans near Coleman's apartment where the knives used in the attack had been discarded. The defendant also showed the officers where other evidence, including drug paraphernalia, clothing, and burnt debris, had been left.

At trial, the State also presented testimony given by the defendant at Leroy Orange's trial on these charges, and at the defendant's own sentencing hearing, conducted following the defendant's earlier guilty plea. At Orange's trial, the defendant claimed that he alone committed the murders and maintained that he stabbed the victims when Orange was not present. The defendant, in the testimony he gave at his sentencing hearing, again said that he alone committed the crimes. On that occasion, however, the defendant also mentioned that he saw red things coming at him when he stabbed the victims.

Defense counsel introduced into evidence Orange's own inculpatory statement to authorities. In that statement, Orange claimed sole responsibility for the crimes.

The defendant also presented the testimony of Dr. Linda Wetzel, a clinical psychologist, who had interviewed the defendant and given him various tests. Dr. Wetzel concluded, among other things, that the defendant was mentally retarded, had brain damage, and possessed a compliant nature.

At the close of evidence, the jury found the defendant guilty of the charges of murder, aggravated arson, armed robbery, and concealment of homicidal death. The matter then proceeded to a capital sentencing hearing. At the first stage of the sentencing hearing, the jury found the existence of three separate aggravating circumstances rendering the defendant eligible for the death penalty: the commission of multiple murders, murder in the course of a felony—armed robbery in this case—and murder of a child under 12 years of age in a brutal or heinous manner. Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(b)(3), (b)(6), (b)(7).

At the second stage of the sentencing hearing, the State presented testimony of the defendant's lengthy record of misconduct, occurring inside and outside prison. The defendant had incurred a substantial number of disciplinary tickets for his infractions while incarcerated. On a number of occasions the defendant threatened prison personnel and other inmates. In one incident, the defendant struck a handcuffed inmate on the head three times with an unopened can of food that was concealed inside a sock. In mitigation, the defendant presented the testimony of Dr. George Savarese, a licensed social worker, who had compiled a comprehensive social history of the defendant. In preparing that report, Dr. Savarese interviewed the defendant's family members and friends, and also reviewed a number of records and reports concerning the defendant. Dr. Savarese described the defendant's troubled childhood and history of drug use, as well as other aspects of the

defendant's life. Following the consideration of evidence in aggravation and mitigation, the jury determined that there was no mitigating circumstance sufficient to preclude a sentence of death. Accordingly, the defendant was sentenced to death for the murder convictions.

The judge sentenced the defendant to consecutive terms of 30 years' imprisonment for the convictions for aggravated arson and armed robbery. The judge imposed terms of five years' imprisonment for each of the four convictions for concealment of a homicidal death. Those sentences were to run concurrently with each other but consecutively to the prison terms for aggravated arson and armed robbery.

## I. Trial Issues

### A

The defendant first argues that he was entitled to a fitness hearing under the rule announced in *People v. Brandon*, 162 Ill. 2d 450 (1994), because he was taking "psychotropic drugs or other medications under medical direction" (725 ILCS 5/104—21(a) (West 1992)) at the time of the trial and sentencing hearing in this case. Specifically, the defendant asserts that he was then taking Dilantin, for treatment of epilepsy, and he further states that he had previously taken two other drugs, Tegretol, also for epilepsy, and Elavil, an antidepressant.

We note that the record discloses only that the defendant was receiving Dilantin at the time relevant here; evidence of his treatment may be found in the testimony of Dr. Wetzel, who related that the defendant was receiving the drug when she interviewed him shortly before trial. It appears that the defendant had epilepsy and that he took Dilantin as treatment for that condition. The State argues, however, that the special protection afforded by section 104—21(a) of the Code of

Criminal Procedure of 1963 must be limited to psychotropic drugs, and that Dilantin is not a psychotropic drug. Our recent opinion in *People v. Britz*, 174 Ill. 2d 163 (1996), resolves a number of the issues here. In *Britz*, this court construed the reference in section 104—21(a) to "psychotropic drugs or other medications" as being limited to psychotropic drugs; accordingly, treatment with a nonpsychotropic medication is not sufficient to trigger the statute. 174 Ill. 2d at 196-97. The question remains whether Dilantin is properly classified as a psychotropic drug, and therefore whether the defendant's use of that medication during trial would have entitled the defendant to a fitness hearing under the provisions of section 104—21(a).

*Britz* further clarified what drugs are psychotropic by adopting the definition found in the Mental Health and Developmental Disabilities Code (405 ILCS 5/1—100 through 6—107 (West 1994)). 174 Ill. 2d at 197-98. Section 1—121.1 of the Code defines the term "psychotropic medication" as a "medication whose use for antipsychotic, antidepressant, antimanic, antianxiety, behavioral modification or behavioral management purposes is listed in AMA Drug Evaluations, latest edition, or Physician's Desk Reference, latest edition, or which are administered for any of these purposes." 405 ILCS 5/1—121.1 (West Supp. 1995). Applying this definition, we conclude that Dilantin is not a psychotropic drug for purposes of the fitness provision of section 104—21(a). Dilantin is prescribed for the treatment of epilepsy, not for any of the purposes specified in the definition found in section 1—121.1 of the Mental Health and Developmental Disabilities Code. Moreover, neither of the references cited in the preceding definition indicate that Dilantin is used for psychotropic purposes. According to the Physician's Desk Reference, Dilantin (phenytoin) is an anticonvulsant drug used to treat

epilepsy and to prevent and treat seizures occurring during or following neurosurgery. Physician's Desk Reference 1906—13 (50th ed. 1996); see also AMA Drug Evaluations 371 (AMA 1994) (phenytoin is a drug used to control epileptic seizures).

Because the defendant was not entitled to a fitness hearing under section 104—21(a), defense counsel could not have been ineffective for failing to seek one pursuant to that provision. Accordingly, we do not address the defendant's additional argument that he received ineffective assistance of counsel when his trial attorneys failed to invoke section 104—21(a).

In the alternative, the defendant asks that we now remand the cause to the circuit court so that additional information may be presented about other medications the defendant might have been receiving at the time of trial. The defendant has found references in various portions of the record in this case to his prior treatment with two other drugs: Tegretol, another epilepsy medication, and Elavil, an antidepressant. The defendant notes that a similar procedure was followed in *People v. Kinkead*, 168 Ill. 2d 394 (1995).

We believe that *Kinkead* is readily distinguishable from the present case. In *Kinkead*, the defendant's presentence report related the defendant's statement that he had been taking Thorazine, a psychotropic drug, while in jail awaiting trial on the charges in that case; the report also noted other drugs the defendant had previously received for treatment of depression. In addition, the report referred to suicide attempts by the defendant, and to his treatment at Menard Psychiatric Center. *Kinkead*, 168 Ill. 2d at 403. The details of the defendant's treatment with Thorazine could not be ascertained from the record, however, and therefore the court believed that a remand was necessary to clarify the schedule of treatment. The court noted further that

there was no indication in the record regarding the possible effects of that drug.

We do not agree with the defendant that *Kinkead* is controlling here. In contrast to *Kinkead,* in the present case, there is no indication in the record that the defendant was actually receiving a psychotropic drug at any point near the time of trial or sentencing in this case. The references to his earlier treatment all predate, by substantial periods, the beginning of the defendant's trial, in May 1993. Moreover, the defendant had been examined by two psychiatrists in November and December 1991 and had been found fit at that time. To adopt the defendant's argument in this case and order a remand for development of a further evidentiary record would mean that a remand must be available in every case in which the record contains some reference to the defendant's long-ago treatment with a psychotropic drug. We decline to extend *Kinkead* in that manner.

B

The defendant next argues that the trial judge erred in failing to grant a defense motion to quash the defendant's arrest and to suppress evidence stemming from the arrest. The police did not have an arrest warrant, and the defendant contends that they lacked probable cause to make the arrest.

The offenses charged here were discovered by authorities sometime after 6 a.m. on January 12, 1983. In the apartment police found an address book containing Leroy Orange's name and providing two addresses for him, 702 E. 75th Street, and 7915 S. Emerald; Leroy's mother and half-brother, the defendant in this case, also resided at the latter address. Investigating officers learned from Enitowec Durr that Leroy Orange had been with Renee and others in the apartment around 9 o'clock the preceding night; Durr had spoken to Renee on the telephone around that time and had

learned in the course of the conversation that Orange was at the apartment. Durr told police that Leroy was Renee's former boyfriend and that the two had not been getting along well. Three persons who had been at Renee's apartment the preceding night reported that Leroy was there when they left, around midnight.

Detectives McNally and McCabe went to the 75th Street address between 2 and 3 p.m. on January 12, where they talked to Mildred Orange, Leroy's wife. Mrs. Orange told the officers that Leroy had left the residence around 7 o'clock the preceding night and had not returned that night. When Mrs. Orange learned that the police were trying to locate Leroy, she called the South Emerald Street address and discovered that he was there. McNally and McCabe remained with Mrs. Orange, while other officers went to South Emerald Street to arrest Leroy. Mrs. Orange also told the officers that when she had arrived home from work that afternoon, she had discovered a pair of shoes, pants, a shirt, and a jacket that had not been there in the morning. Mrs. Orange was able to identify the pants as belonging to the defendant.

Around 3:45 that afternoon, Mrs. Orange received a telephone call from the defendant. Officers McNally and McCabe were still with her. In the telephone call, the contents of which Mrs. Orange later related to the officers, the defendant said that Leroy had been arrested, and the defendant asked Mrs. Orange to call the police and find out what the charges were. The defendant also said that he needed to talk to Mrs. Orange, and he made arrangements to meet her at a McDonald's restaurant. The defendant told Mrs. Orange " 'that he and Leroy were involved in something that could put him in jail for the rest of their lives.' " Later that afternoon, the defendant was arrested at the McDonald's restaurant where Mrs. Orange had gone to meet him.

To effect a warrantless arrest, a police officer must have probable cause to believe that an offense was committed and that the person to be arrested committed it. *Beck v. Ohio*, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225 (1964); *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986); see also Ill. Rev. Stat. 1983, ch. 38, par. 107—2(1)(c). Under the probable cause standard, "[e]vidence that will sustain a conviction is not required, but more than mere suspicion is necessary. [Citation.]" *In re D.G.*, 144 Ill. 2d 404, 412-13 (1991) (Miller, C.J., dissenting). The burden is on the defendant to show the illegality of the challenged search or seizure. Ill. Rev. Stat. 1983, ch. 38, par. 114—12(b). A trial court's ruling on a motion to suppress will not be reversed on appeal unless it is manifestly erroneous. *People v. Williams*, 147 Ill. 2d 173, 209 (1991). There was no doubt in the present case that crimes had been committed; the only relevant question before the police officers was whether the defendant was one of the persons involved in their commission.

In making a warrantless arrest of the defendant, the police relied on information provided to them by Mildred Orange and on other information they had acquired in the course of their investigation of these offenses. We conclude that the officers had probable cause to arrest the defendant for these offenses. Following their conversations with Mrs. Orange and their investigation of the crime scene and of evidence found there, the police knew that the defendant had implicated himself in an unspecified offense with his brother, Leroy Orange. The police also knew that Leroy Orange had been present at the crime scene the preceding night, several hours before the murders. Also, the police knew from Mrs. Orange that a change of clothes had been left in her apartment that day, and that at least one of those garments belonged to the defendant.

From the circumstances of the offenses, the police also would have realized that it was likely that more than one offender was involved. The number of victims and the condition in which they were found strongly suggested that the crimes in this case were the work of multiple offenders; that three adults and one child had been tied up and repeatedly stabbed suggested the actions of more than one person. Thus, when the defendant implicated himself to Mrs. Orange in an offense in which he said Leroy was also involved, the police would have had probable cause to believe that the defendant was involved in the crimes in this case.

The defendant argues, however, that Mrs. Orange must be considered an informant, and the defendant maintains that she was of untested and unestablished reliability. Mrs. Orange does not fit easily into either of the two major categories by which informants have traditionally been classified. Although Mrs. Orange was not a witness or victim of the crime, she was not a paid informant, either. Still, the importance of those classifications is less significant than it once was. "[I]t matters not by what name the informant is labelled; we look rather to the informant's reliability as only one of the factors to be considered in the totality of the circumstances approach. [Citations.]" *People v. Adams*, 131 Ill. 2d 387, 397 (1989). As this court has explained:

"The rationale of protecting against unreasonable search and seizures by demanding reliable information from informants is still relevant under the totality of the circumstances test adopted by this court in *People v. Tisler* (1984), 103 Ill. 2d 226. Thus, the basis of the informant's knowledge is indeed relevant (*i.e.*, whether it is based on being a victim or witness or whether he is a reliable paid informant); however, the rigidity embodied in the presumptions concerning the classifications is no longer applicable." *Adams*, 131 Ill. 2d at 398.

"Thus, based on an evaluation of all of the information available, including the source of the information, the

question is one of whether there is probable cause to believe that the individual in question is involved in criminality." *Adams*, 131 Ill. 2d at 398.

We believe that the circumstances here satisfy the standards relating to arrests based on informants' tips. The totality of the circumstances known to the arresting officers fully supported their reliance on the information provided by Mrs. Orange. Immediately after the conversation with the defendant, Mrs. Orange told the officers who were present in her apartment what the defendant had just said; she had no time to fabricate. In *People v. Wright*, 111 Ill. 2d 128, 146 (1985), this court noted:

> "[D]ecisions analyzing the probable cause standard reveal that it is a 'practical, nontechnical conception.' [Citation.] 'In dealing with probable cause, *** we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.' [Citations.]"

Given the circumstances of the police officers' visit with Mrs. Orange, and the information she provided to them, the arresting officers were justified in crediting her report of her telephone conversation with the defendant. The defendant's contention that Mrs. Orange's conduct should be viewed as an attempt to deflect attention away from her husband is without merit, for she helped the police locate Leroy, and she told the officers about the defendant's statement implicating Leroy.

The defendant notes that the testimony at the suppression hearing showed that he told Mrs. Orange that he and Leroy had done something that could put "him" in jail. Emphasizing the singular "him," the defendant argues that the statement must be construed as implicating only Leroy. We do not agree. First, the remainder of the statement contains a number of plural elements: the comment that "he and Leroy were involved" in

something, and the reference to "their lives." In addition, Mrs. Orange's testimony at trial below, and the defendant's testimony at Leroy Orange's trial, also introduced into evidence in this case, related a slightly different version of the statement, in which the defendant quite clearly implicated himself in Leroy's offenses. Thus, at the defendant's trial, Mrs. Orange testified that the defendant told her, " 'Mildred, I've got something to tell you that could put me and Poky [*i.e.*, Leroy] away for the rest of our lives.' " In testimony at his brother's trial, also introduced into evidence here, the defendant recounted, "I said we done something bad that could put us in jail for the rest of our life [*sic*]." We may consider these additional pieces of testimony even though they were not introduced at the suppression hearing; in reviewing a pretrial suppression ruling, a court may rely on evidence introduced at the ensuing trial. *People v. Sims*, 167 Ill. 2d 483, 500 (1995); *People v. Caballero*, 102 Ill. 2d 23, 33-36 (1984); *People v. La Bostrie*, 14 Ill. 2d 617, 620-21 (1958). It thus seems clear that the defendant implicated both himself and Leroy in the unspecified offenses.

In conclusion, we believe that the trial judge's decision to deny the defendant's motion to quash the arrest was not against the manifest weight of the evidence. The testimony showed that the police had probable cause to believe that the defendant was involved in the present offenses. The defendant's inculpatory statement to Mrs. Orange, the circumstances of the offenses, and Leroy's presence at Renee's apartment hours before the crimes provided the police with probable cause to arrest the defendant. We note that our conclusion that the officers had probable cause to arrest the defendant is not altered even if we use a *de novo* standard of review for this mixed question of law and fact. See *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S.

Ct. 1657 (1996) (applying *de novo* standard of review to issues involving reasonable suspicion to stop vehicle and probable cause to conduct search). We believe that probable cause for the defendant's arrest was established by the circumstances in this case, summarized above, including the defendant's statement to Mrs. Orange, Leroy's presence at the apartment the preceding night, and the likely involvement of more than one offender.

C

The defendant also argues that the trial judge erred in denying his motion to suppress his statements. The defendant contends that the statements were the products of physical coercion inflicted by the police officers who interrogated him. The defendant asserts that the trial judge erred in refusing to suppress his statements because the State failed to demonstrate, by clear and convincing evidence, that his injuries were not the result of police misconduct. See *People v. Wilson*, 116 Ill. 2d 29 (1987); *People v. La Frana*, 4 Ill. 2d 261 (1954).

Unlike the cases cited by the defendant, there was no showing here that the defendant sustained an injury while in police custody. At the suppression hearing, the police officers who interrogated the defendant denied the defendant's allegations of mistreatment. Dennis Dernbach, the assistant State's Attorney who had taken the defendant's formal statement, and who is now a judge, testified that the defendant had no complaints about his treatment while in custody. Dernbach had noticed a mark on the defendant's forehead, and the defendant explained that he had incurred it a week or two earlier, when he was the victim of a robbery. This injury is depicted in a photograph taken at the conclusion of the defendant's formal statement, as well as in a photograph taken at the Cook County jail the next day. The defendant did not testify at the suppression hearing.

The State must show by a preponderance of the evidence that the defendant made the statement voluntarily. *People v. R.D.*, 155 Ill. 2d 122, 134 (1993); *People v. King*, 109 Ill. 2d 514, 525 (1986); Ill. Rev. Stat. 1987, ch. 38, par. 114—11(d); see *Lego v. Twomey*, 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619, 627 (1972). Voluntariness will be determined by considering the totality of the circumstances. *People v. Smith*, 152 Ill. 2d 229, 253 (1992); *People v. Melock*, 149 Ill. 2d 423, 447 (1992); *People v. Clark*, 114 Ill. 2d 450, 457 (1986). A reviewing court will reverse the trial court's disposition of a motion to suppress a statement only if the ruling is against the manifest weight of the evidence. *People v. Jones*, 156 Ill. 2d 225, 242-43 (1993); *People v. Evans*, 125 Ill. 2d 50, 77 (1988); *People v. Kincaid*, 87 Ill. 2d 107, 120 (1981).

We find no reason to disturb the trial judge's ruling in the present case. The testimony at the suppression hearing established that the defendant's statements were not the products of coercion. Although there is photographic evidence that a mark was present on the defendant's forehead after he made his statement, there was no testimony that the defendant received that injury while he was in police custody, or that he did not have that injury before being taken into custody. In fact, the evidence in this case suggests otherwise. Dernbach's testimony showed that the defendant had sustained his one visible injury sometime before he was taken into custody, when he was the victim of a robbery. The defendant told Dernbach that the officers had treated him all right and that he did not have any complaints about his treatment. In addition, all the officers who took part in the interrogation of the defendant denied any mistreatment of him. It was the trial judge's responsibility to determine the credibility of the witnesses, and he was entitled to credit the testimony introduced by the prosecution. On this record, we can-

not say that the decision to deny the defendant's suppression motion was contrary to the manifest weight of the evidence.

## D

The defendant next argues that the trial judge erred in allowing the State to introduce into evidence in this case the defendant's testimony at Leroy Orange's trial on these charges and the defendant's testimony at his own earlier sentencing hearing. The defendant raises three arguments in support of the exclusion of these statements. The defendant contends that in introducing the earlier testimony the State was presenting false evidence. In addition, the defendant argues that the testimony he gave at Orange's trial resulted from a conflict of interests on the part of his former trial attorney and must now be excluded on that ground. Finally, the defendant maintains that the testimony at the earlier sentencing hearing was tainted by the defective guilty plea that preceded it. The defendant moved before and during trial to exclude the two statements, but the trial judge refused to do so, and the evidence was admitted over the defendant's objections. We believe that both statements were admissible, and we find no error in their introduction into evidence in the present case.

The defendant first argues that both excerpts of his earlier testimony required exclusion here because the evidence was false. The defendant contends that admission of the statements in the present case therefore violated the rule forbidding the prosecution to knowingly present perjured testimony. See *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959); *People v. Jimerson*, 166 Ill. 2d 211, 223 (1995).

In support of this theory, the defendant notes that when he testified at Orange's trial, the prosecution

impeached him with the statements he made to the police following his arrest; in the station house statements, the defendant said only that he was present at the crime scene, and he maintained that he did not take part in the commission of the offenses. The defendant apparently believes that the State has conceded the falsity of any statement by the defendant in which he admits his involvement in these offenses.

We do not believe that the rule prohibiting the prosecution's knowing use of perjured testimony is applicable here, or was designed to reach the conduct complained of in this case. The statements at issue were all made by the defendant and, so long as they were relevant to the case, could be introduced against him as admissions of a party opponent. *People v. Simpson*, 68 Ill. 2d 276, 282 (1977); *Gillson v. Gulf, Mobile & Ohio R.R. Co.*, 42 Ill. 2d 193, 197 (1969). If the defendant has given various accounts of his activities on the night of the offenses, then, as the trial judge noted in refusing to exclude the prior testimony, "that's his problem, and he has to live with it." We do not believe that the State must now be disabled from presenting the defendant's earlier inculpatory statements simply because there are discrepancies in what the defendant has said at different times on different occasions.

The defendant also argues that his testimony at the Orange trial must be excluded because it was the product of a conflict of interest involving his former attorney, Earl Washington. Washington originally represented both the defendant and Leroy Orange on these charges. Washington later withdrew from the defendant's case, however, and the public defender was then appointed to represent the defendant in this case.

The defendant notes that under the present Rules of Professional Conduct, an attorney who ceases to represent a client may not later pursue a course of represen-

tation that is inimical to the earlier client's interests. 134 Ill. 2d R. 1.9. The defendant also cites cases in which an attorney has appeared as both prosecutor and defense counsel in the same proceeding. See *People v. Lawson*, 163 Ill. 2d 187 (1994); *People v. Kester*, 66 Ill. 2d 162 (1977). The defendant likens Washington's role here to that of a prosecutor, for, as the defendant notes, Washington pursued a theory of defense at Orange's trial that alleged the defendant's sole responsibility for these crimes.

We find no evidence here that the defendant's testimony in his brother's case can be attributed to a conflict of interests involving the defendant, Earl Washington, and Orange. Washington was no longer representing the defendant when the defendant testified at Orange's trial; Washington's representation of the defendant had ceased long before that point. Although the defendant notes that Washington later provided authorities with information incriminating to the defendant in another case, which is the subject of a separate prosecution (see *People v. Kidd*, 147 Ill. 2d 510 (1992)), the defendant fails to explain how his decision to testify on Orange's behalf at Orange's trial was anything other than the defendant's own decision, or how Washington exploited any confidential information he might have acquired during his former representation of the defendant.

The defendant has not identified any particular facts that show how his testimony at Orange's trial resulted from a conflict of interests. Assuming that exclusion would be necessary if the defendant's prior testimony was a consequence of his former attorney's conflicting interests, we do not believe that the defendant has established the factual predicate that would trigger application of that rule. We find no error in the trial judge's decision here to allow the State to present the

testimony given by the defendant at Leroy Orange's trial.

The defendant raises an additional challenge to the use in this case of the testimony he gave following an earlier plea of guilty to these charges. The defendant was sentenced to death at that time. The plea was defective, however, and was vacated by this court on appeal (*People v. Kidd*, 129 Ill. 2d 432, 443-47 (1989)) because the defendant had not been told of the minimum mandatory sentence he would face if convicted on the charges. Of course, at trial below, the jury was informed only that the defendant's testimony was from a prior, unspecified proceeding; the jurors were not told of the defendant's earlier plea or sentence or the outcome of the earlier appeal.

The defendant contends that the invalidity of the plea that preceded the earlier sentencing hearing tainted his testimony at that hearing and rendered those statements inadmissible at the present trial, or, as the State aptly notes, that the testimony at the sentencing hearing was the "fruit of a poisonous plea." As a preliminary matter, we do not agree with the State that the defendant has waived consideration of this point. During trial, in seeking to exclude this evidence, defense counsel argued that vacatur of the plea should preclude use of the testimony from the sentencing hearing. We conclude that counsel preserved the objection.

Turning to the merits of the defendant's argument, we do not believe that the invalidity of the defendant's prior plea necessitates the exclusion of the testimony given by the defendant at the ensuing sentencing hearing. In the present circumstances, there would be no point in precluding the State from using testimony given by the defendant at the sentencing hearing that followed the plea. The defendant's testimony was voluntary, and we do not believe that a rule requiring its

exclusion can be justified as a means of deterring the occasional errors committed by judges in accepting guilty pleas.

Citing *Harrison v. United States*, 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008 (1968), the defendant asserts that the testimony he gave at the earlier sentencing hearing was the product of the invalid plea that preceded it. We believe that *Harrison* is distinguishable. In that case, the defendant's confessions were introduced into evidence at trial, and the defendant testified in his own behalf, seeking to overcome the impact of those statements. The defendant's conviction was reversed on appeal, however, because the statements were inadmissible. On retrial, the prosecution introduced Harrison's testimony from the first trial. The Supreme Court held that the testimony given by Harrison at the original trial had been offered by the defendant to overcome the impact of the illegally admitted evidence, and thus the testimony could not later be used against him as evidence of guilt.

In the present case, unlike *Harrison*, there was no causal connection between the trial judge's failure to correctly admonish the defendant about his minimum sentence and the defendant's subsequent testimony at the sentencing hearing, during which he admitted his involvement in these crimes. In the present case, the defendant's testimony at his sentencing hearing was consistent with his earlier plea, and, unlike the testimony in *Harrison*, cannot be said to have been offered by him to overcome the impact of the earlier illegality. The defendant in this case voluntarily chose to testify at that time.

In any event, we believe that any error in the introduction of the testimony from the sentencing hearing was harmless beyond a reasonable doubt. See *Arizona v. Fulminante*, 499 U.S. 279, 113 L. Ed. 2d 302,

111 S. Ct. 1246 (1991). The prosecution introduced other inculpatory statements by the defendant, including his testimony at Orange's trial, in which the defendant admitted his participation in the crimes. Other evidence established that the defendant had directed the police to where the murder weapons could be found. On this record, we believe that any error in the introduction of the sentencing hearing testimony was harmless beyond a reasonable doubt.

## E

The defendant next asserts error in the State's use at trial of identification testimony by a fireman who saw the defendant at the crime scene shortly after the commission of the offenses charged here. Chicago fire fighter James Thomas testified that as he was walking to a fire engine to obtain a piece of equipment, someone approached him and asked whether anyone inside the building had died; Thomas replied affirmatively. The person then asked whether the bodies had burned; Thomas replied that they had not burned. According to Thomas, the person then uttered the word "Damn" and walked away. This encounter occurred sometime before 7 o'clock on the morning of the fire, January 12, 1983. Two days later, on January 14, Thomas was reading a newspaper account of the offenses and thought that he recognized one of the two men pictured in the story as the person who had approached him with the question about the victims. Thomas relayed this information to his lieutenant. Several days later, police officers showed Thomas the same news story, and Thomas made the same identification. At trial, Thomas identified the defendant as the man who had approached him at the fire and as the person whose photograph he had seen in the newspaper.

The defendant argues that Thomas' identification was tainted because officers showed Thomas the same

newspaper photographs and failed to conduct a lineup. We do not agree. The witness' in-court identification of the defendant had an independent origin and was not based on any allegedly suggestive technique employed by the police. See *Simmons v. United States*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971 (1968); *People v. Williams*, 60 Ill. 2d 1, 10-11 (1975).

Nor do we agree with the defendant that the State misrepresented to the jury the strength of the witness' testimony. In a *voir dire* examination conducted outside the presence of the jury, Thomas allowed that he was not certain that the defendant was the man whom he had seen on the morning of the fire; Thomas said, "To be perfectly honest, I couldn't say exactly that that's the man." Before the jury, on direct examination, the prosecutor simply asked Thomas whether the person Thomas had talked to on the morning of the fire was in the courtroom; Thomas replied that the man was in the courtroom and identified the defendant. Later, during cross-examination, Thomas acknowledged that he was not absolutely certain that the defendant was the man he had seen. The circumstances of Thomas' identification of the defendant were before the jury, including the details of their brief conversation more than nine years before the present trial. We find no error in the admission of this testimony.

F

The defendant next complains of the admission of certain testimony at the guilt phase of the proceedings below. The defendant first argues that the medical examiner provided speculative testimony regarding which of the four weapons used by the offenders in this case could have produced the injuries sustained by the victims. Dr. Nancy Jones, a forensic pathologist employed in the Cook County medical examiner's office, testified regarding the autopsies performed on the

victims by Dr. Robert Stein, the former chief medical examiner of Cook County, who had since retired and who did not testify at trial. Dr. Jones had reviewed Dr. Stein's reports, and she had also examined the photographs depicting the victims' injuries. Dr. Jones had also compared the four knives recovered by authorities in their investigation of the case with the information concerning the victims' stab wounds, and in her testimony she explained which knives could have caused the injuries to the victims. The defendant argues that this portion of Dr. Jones' testimony was speculative at best, challenging the basis for many of her conclusions.

Defense counsel was, of course, free to cross-examine the witness on the strength of her testimony, and on her ability to assess, from Dr. Stein's reports and from her own observations of the knives and morgue photographs, which weapons might have been used. We believe that the weaknesses the defendant perceives in Dr. Jones' testimony pertain to its strength rather than to its admissibility, and we do not believe that the trial judge erred in permitting the jury to hear this evidence.

The defendant also argues that Detective McCabe offered improper hearsay testimony when he repeated to the jury Mildred Orange's summary of her telephone conversation with the defendant on the afternoon of January 12. The trial judge overruled defense counsel's hearsay objection to the testimony. We agree with the defendant that this portion of McCabe's testimony was hearsay and should not have been admitted into evidence. We do not, however, believe that the defendant was denied a fair trial by the judge's adverse ruling. The jury had already heard Mrs. Orange testify to the same statement by the defendant, and, as the trial judge noted, McCabe's separate account was essentially cumulative of the earlier testimony.

The defendant contends, however, that McCabe

added to the description of the telephone conversation a detail that was absent from Mrs. Orange's account. According to McCabe, the defendant told Mrs. Orange that what he and Leroy had done had occurred "last night." The defendant notes that the prosecutor found this additional bit of information significant enough to be worthy of mention in closing argument.

We do not believe that the trial judge's decision to admit this testimony could have denied the defendant a fair trial. The evidence of the defendant's guilt for these offenses was overwhelming, and we do not believe that the present hearsay testimony proved to be prejudicial. The jury heard the series of statements in which the defendant admitted a role in these crimes, and the testimony describing the way in which the defendant was able to lead investigators to the murder weapons.

In a further challenge to evidence presented at trial, the defendant argues that Mildred Orange was improperly allowed to provide the jury with her assessment of the defendant's personality. The testimony was presented when the prosecutor asked Mrs. Orange whether or not the defendant had a compliant personality. Mrs. Orange replied that he did not, saying that the defendant "did whatever he wanted to do." The trial judge overruled the defendant's objection to Mrs. Orange's comment. On appeal, the defendant renews his contention that the witness was not qualified to provide an assessment of his personality. We do not consider here whether Mrs. Orange was properly qualified to express an opinion on the subject, for, even if she was not, we do not believe that the admission of the testimony was prejudicial to the defendant. As we have noted, the State presented overwhelming evidence of the defendant's guilt. Although the defense offered evidence of the defendant's compliant personality to help explain what led the defendant to testify at Leroy Orange's trial, we

do not believe that this brief attempt by the State to rebut a portion of the defense theory could have deprived the defendant of a fair trial.

### G

The defendant next argues that the trial judge abused his discretion in allowing the jury, at the close of the State's case in chief, to view a large number of photographs of the decedents. These pictures were taken either at the crime scene or during the autopsies of the victims, and they depict the victims' injuries and the condition in which the victims were found.

"Photographs of a victim, though gruesome, may be admissible if relevant. (*People v. Shum* (1987), 117 Ill. 2d 317, 353-54; *People v. Lindgren* (1980), 79 Ill. 2d 129, 143.) The decision whether to admit photographs into evidence is committed to the discretion of the trial judge, whose determination will be upheld unless it is an abuse of discretion. *People v. Rissley* (1995), 165 Ill. 2d 364, 403; *Shum*, 117 Ill. 2d at 353." *People v. Bounds*, 171 Ill. 2d 1, 47 (1995).

In the present case, the trial judge examined the photographs in chambers before allowing the jury to view them. Following that evaluation, the judge concluded that a number of them could not be presented to the jury. The judge permitted the jury to see the remainder of the photographs, approximately 40 in all. We have reviewed the same exhibits and find no abuse of discretion in the trial judge's determination of which exhibits could be shown to the jury.

This court has previously observed that photographic evidence is admissible to show the nature and extent of a victim's injuries, the condition or location of a body at the crime scene, or the manner or cause of death, among other uses. *People v. Henderson*, 142 Ill. 2d 258, 319-20 (1990). The photographs challenged by the defendant fulfilled these purposes here. They showed the restraints

used on the victims, as well as the number and severity of their stab wounds. In addition, the photographs assisted the jury in understanding the forensic testimony introduced by the prosecution. We find no abuse of discretion in the use of these photographs at trial.

The defendant also complains that the timing of the publication of these exhibits was especially prejudicial. The photographs were shown to the jury over the defendant's objection at the close of the State's case in chief. Trial counsel thought that the nature of the photographs would distract the jurors from a consideration of the defendant's evidence, and counsel wanted to postpone presentation of these exhibits until the close of evidence in the case.

We do not believe that the judge abused his discretion in permitting the photographs to be shown to the jury at the close of the State's evidence. The photographs had been referred to extensively in the earlier testimony, and that was a logical point in the proceedings at which to publish them to the jury. The disturbing nature of these exhibits would not have been reduced by delaying their presentation; they were admissible, and they could be shown to the jury.

## H

The defendant also raises a number of challenges to various portions of the State's closing argument at trial. The defendant first complains of a series of remarks that, he contends, improperly disparaged defense counsel and denigrated the defense attorneys' efforts on behalf of their client. At one point, the prosecutor said, "It is our job to assure that justice is done and the truth be told." Defense counsel did not object to that comment, and therefore any challenge here has been waived. Later, in rebuttal, the prosecutor said that the defendant's various lies were designed to distract the jurors and to muddy up the waters. The trial judge over-

ruled defense counsel's objections to these remarks. Unlike the defendant we do not believe that these last remarks were targeted at defense counsel; the prosecutor was referring to the defendant, not to his attorneys. We find no error in the remarks, which were fair comments on the evidence.

The defendant also challenges a remark by the prosecutor that a not-guilty verdict would enable the defendant to avoid punishment for the present offenses and thus commit the perfect crime. We agree with the State that the jurors would not have construed this comment as an attack on the integrity of defense counsel. Counsel did not object to the later comment that, "to that end, he dispatches his attorneys up here," and we thus conclude that the defendant has waived his challenge to that remark.

The trial judge sustained defense counsel's objection to a comment that one imperfection of the criminal justice system is that the defendant can "lie and lie and lie" and that his attorneys "can stand up here and argue to you that those lies stand as proof of his innocence." In light of the judge's ruling, we do not consider this comment further.

The defendant next cites a comment by the prosecutor declaring that defense counsel had made a "bald-faced claim" in opening statement. In this remark, the prosecutor was referring to defense counsel's earlier assertion that the defendant led police to where Leroy Orange had hidden the murder weapons. The identity of the person who had disposed of the weapons was disputed, and we believe that the prosecutor's comment was directed at the evidence on that point, and not at counsel personally.

The defendant also takes issue with a remark in which the prosecutor asserted that defense counsel wanted the jury to misunderstand the significance of

the clothing found by Mrs. Orange after the offenses here. The interpretation of this evidence was the subject of some dispute by the parties, and we do not believe that the prosecutor's brief comment was unfair or unwarranted.

The defendant next complains that the prosecution misstated the law of accountability at various points during summation and rebuttal by misrepresenting the mental state necessary to sustain a verdict under an accountability theory. The prosecutors made a number of comments concerning accountability; one of them also read the accountability instruction to the jurors. We note that defense counsel did not object to all the comments cited in the defendant's brief, and therefore the challenges to those remarks have been waived. We believe that, taken as a whole, the comments by the prosecution on accountability were not misleading. We note that the jurors received accurate instructions setting forth the law of accountability. In addition, the jurors were properly instructed regarding the purpose of closing arguments.

The defendant also contends that a further comment by the prosecutor aggravated these alleged errors, when the prosecutor stated, in rebuttal, that the burden of proof beyond a reasonable doubt "is a burden of proof that is met in courtrooms across this county and in this building each and every day, and it is a burden of proof that has been met here." The defendant contends that this last comment improperly minimized the importance of the State's burden of proof. Defense counsel did not object to this last comment, however, and therefore has waived this contention. We note, moreover, that this court has previously rejected the argument that comments of this nature improperly reduce the State's burden of proof. *People v. Gacho*, 122 Ill. 2d 221, 255 (1988).

The defendant also complains that, in another series of comments, the prosecutor improperly criticized a defense witness and her testimony concerning the defendant's mental abilities. In argument, the prosecution referred to the witness on one occasion as "Miss Wetzel," though she possessed a Ph.D. degree, and said that it was "unfortunate indeed that she didn't test [the defendant's] moral fiber because we would have found he has none." The prosecutor also argued that the witness' testimony was irrelevant and said that the defendant was not mentally retarded. In addition, the prosecutor asserted that, by the law of averages, half the population must be of below-average intelligence. The defendant maintains that Dr. Wetzel's testimony was relevant in this case, and asserts that the evidence established that the defendant was mentally retarded. We believe that the preceding remarks were either fair comments on the evidence in the case, or were so minor that they could have had no influence on the jury's deliberations.

The defendant's final challenge to the State's closing argument at trial involves a comment by the prosecutor concerning the victims' surviving family members. At the conclusion of his rebuttal argument, the prosecutor stated:

"After today, when you think about this case, however often or however seldom, when you do think about it, think about Renee and Michelle and Ricardo. If you're religious, offer a prayer. If you're not, just—just imagine what this must have been like for them, and imagine what it's like now for the family. When you think about the case, shed a tear for Tony Coleman.

[Defense counsel]: Objection.

THE COURT: Sustained. The jury will disregard that.

MR. JOYCE: Well, just think then about this nine-year-old boy who will never light up his grandfather's home with his infectious smile, who was nine years old and today is nine years dead. Remember him however you

will, but remember him not because that is the least, but because that is the beginning—the beginning of the very least we can do. Thank you."

The trial judge's ruling sustaining the defendant's objection to the initial reference to the victims should have been sufficient to forestall any prejudice. We do not believe that the rhetorical flourish of the prosecutor's ensuing comment could have been prejudicial here.

I

The defendant argues that there was insufficient evidence of facts supporting his convictions for felony murder and armed robbery. Armed robbery served as the predicate felony for the felony murder charges, and the defendant argues here that the State's evidence failed to establish that offense. The armed robbery charge alleged the defendant's taking of Ricardo Pedro's watch, which the defendant was wearing at the time of his arrest. The defendant argues that the prosecution was required to prove that he used force or the threat of force as the means of taking the property from the victim. Citing *People v. Tiller*, 94 Ill. 2d 303 (1982), and *People v. Pack*, 34 Ill. App. 3d 894 (1976), the defendant believes that the evidence in this case establishes nothing more than that he took the watch from Pedro as an afterthought.

Section 18—1(a) of the Criminal Code of 1961 defines the offense of robbery in the following terms: "A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force." Ill. Rev. Stat. 1983, ch. 38, par. 18—1(a). Armed robbery is the commission of robbery while armed with a dangerous weapon. Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a).

This court addressed a similar argument in *People v. Strickland*, 154 Ill. 2d 489, 523-25 (1992). In that case, we rejected a defendant's contention that his armed rob-

bery conviction had to be reversed because there was insufficient evidence that the force exerted by the defendant against the victim was intended or used as a means of taking the victim's property. The court quoted the following language from *People v. Jordan*, 303 Ill. 316, 319 (1922):

"The fact that the defendant [*sic*] had been reduced to a state of physical non-resistance before his money was taken does not relieve the crime of the quality constituting robbery. If, as the result of a quarrel, a fight occurs in which one of the parties is overcome, and the other then, without having formed the intention before the fight began, takes the money of the vanquished one, the offense committed is robbery."

*Strickland* found the principle expressed in *Jordan*, a decision under former law, to be applicable to the current statute as well. *Strickland*, 154 Ill. 2d at 524. "Section 18—1 of the Criminal Code requires that the taking be accomplished by force or the threat of force. Such was obviously the case here, regardless of whether the defendant had previously formulated an intent to take the [victim's] weapon or other property." *Strickland*, 154 Ill. 2d at 524-25.

We believe the evidence in this case was sufficient to establish the defendant's guilt for armed robbery. When the defendant was asked by the police how he happened to have Pedro's watch, the defendant initially explained that he had received it from the victim in exchange for the TV/radio. The defendant later said that Pedro had given him the watch but had asked him not to tell Leroy Orange about the gift. In his testimony at Orange's trial, however, the defendant said that he stabbed Pedro, later took the watch from Pedro's arm, and subsequently murdered him. The jury was entitled to accept this last explanation as the truth, and we find no reason here to disturb these verdicts. Moreover, even if the defendant's use of force preceded the actual taking of the property,

the offense would still be armed robbery under *Strickland* and *Jordan*. As in *Strickland*, we conclude that there was the necessary concurrence between the defendant's use of force and his taking of Ricardo Pedro's watch. See also *People v. Ward*, 154 Ill. 2d 272 (1992); *People v. Blake*, 144 Ill. 2d 314 (1991); *People v. Williams*, 118 Ill. 2d 407 (1987).

J

The defendant next argues that the trial judge erred in denying one of the issues raised by the defendant in a *pro se* post-trial motion without having first appointed new counsel to represent him. The defendant asserts that once he submitted a *pro se* motion for a new trial that challenged the conduct of the trial attorneys, the judge was obligated to appoint alternative counsel to represent him on the motion. Among the numerous claims raised in the two post-trial motions filed by the defendant *pro se* was the charge that trial counsel failed to subpoena and present at trial the testimony of two alibi witnesses. The motion in which this allegation appears does not identify these persons or otherwise shed any light on who they might be. On appeal, the defendant argues that he was essentially raising an ineffective assistance claim, though his motions do not couch the point in those terms, and the defendant insists that he was entitled to have different counsel represent him on the issue. See *People v. Krankel*, 102 Ill. 2d 181, 189 (1984). We do not agree.

In *People v. Nitz*, 143 Ill. 2d 82, 133-35 (1991), this court determined that different counsel is not automatically required in every case in which a defendant files a motion challenging the performance of his trial attorney. See also *People v. Williams*, 147 Ill. 2d 173, 250-53 (1991). If the matters raised in a defendant's *pro se* motion clearly lack merit or merely pertain to matters of trial strategy, the trial court "may dispose of the

motion without having appointed a new attorney to assist the defendant in the presentation of those claims." *People v. Strickland*, 154 Ill. 2d 489, 527 (1992). "If, however, the defendant's allegations of incompetence indicate that trial counsel neglected the defendant's case, the court should appoint new counsel to argue defendant's claims of ineffective assistance of counsel." *Nitz*, 143 Ill. 2d at 134-35.

Here, the only *pro se* allegation mentioned by the defendant on appeal involves counsel's failure to call two unnamed alibi witnesses to testify in the defendant's behalf at trial. Whether to call certain witnesses and whether to present an alibi defense are matters of trial strategy, generally reserved to the discretion of trial counsel. See *People v. Ramey*, 152 Ill. 2d 41, 53-54 (1992). We would note that an alibi defense would have been particularly weak in this case, given the series of statements made by the defendant in which he placed himself at the crime scene, whether as a passive onlooker to his brother's rampage or as an active participant in the offenses. Because the matter complained of clearly lacked merit and simply involved a question of trial strategy, we conclude that the trial judge did not err in failing to appoint counsel to represent the defendant in connection with this allegation in the *pro se* motion.

## K

The defendant next argues that his conviction for aggravated arson must be reversed because the statute on which the charge is based has been declared unconstitutional. The State agrees with the defendant that the conviction is invalid. The parties do not agree, however, on the effect of the reversal on the defendant's death sentence. The defendant was convicted of aggravated arson under section 20—1.1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1(a)(1)); that provision has been held unconstitutional,

however (*People v. Johnson*, 114 Ill. 2d 69, 73 (1986)), and convictions under the unconstitutional statute have accordingly been reversed on appeal (see *People v. Kidd*, 129 Ill. 2d 432, 457 (1989); *People v. Orange*, 121 Ill. 2d 364, 392 (1988)). The same result is necessary here, and therefore we reverse the defendant's conviction for aggravated arson and vacate the 30-year sentence imposed for that offense.

The defendant also briefly contends that the invalidity of the aggravated arson conviction requires that he receive a new sentencing hearing. The same argument was rejected in *Orange*, 121 Ill. 2d at 392-93, and we believe the same result appropriate here. The aggravated arson charge did not form the basis for any one of the three statutory aggravating circumstances used to establish the defendant's eligibility for the death penalty in this case. Nor did the additional conviction figure prominently at the second stage of the sentencing hearing, when the jury determined whether the defendant should be sentenced to death. Moreover, notwithstanding the invalidity of the statute defining the charged offense, the jury was free to consider the conduct on which the charge was based. We conclude here, as we did in *Orange*, that the reversal of the defendant's conviction for aggravated arson does not require a new sentencing hearing.

## II. Sentencing Issues

### A

The defendant also makes a number of challenges to the death sentence proceedings conducted in this case. The defendant first raises several arguments with respect to the trial judge's examination of the prospective jurors concerning their attitudes toward capital punishment. The defendant contends that the questioning conducted by the judge in this case failed to properly

"life qualify" the venire under *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992), and that the judge erred in refusing to use several questions proposed by defense counsel. The defendant maintains that the questions used by the judge did not properly detect members of the venire who would automatically vote to impose the death penalty.

We believe that the judge's inquiry was sufficient to satisfy the requirements of *Morgan*. In the present case, the judge asked each prospective juror whether the person would automatically vote for the death penalty no matter what the facts of the case might be. In addition, the judge asked whether the person could consider all the possible penalties under the law if the defendant were found guilty. We believe that the trial judge's inquiry was sufficient under *Morgan*.

In a further argument relating to jury selection, the defendant contends that the *voir dire* responses of two of the persons who served on the jury in this case demonstrated their inability to impartially determine whether the defendant was deserving of the death penalty. The State responds that the jurors did not make disqualifying statements at *voir dire* and were properly allowed to serve on the jury. The State also observes that defense counsel waived any objection to these persons because the attorneys did not make any challenges to these members of the venire. We agree with the State that the defendant waived his objections to these two jurors (*People v. Collins*, 106 Ill. 2d 237, 271-72 (1985)), and we need not consider these contentions further.

### B

The defendant next raises two arguments relating to the first stage of the capital sentencing hearing. The defendant argues that the prosecutor made an improper appeal to the jury at the conclusion of the eligibility

stage of the hearing when, in rebuttal argument, he said that defense counsel, in requesting the jury to find the defendant not eligible for the death penalty, was in reality asking the jurors to violate their oaths and abrogate their responsibilities. The trial judge overruled defense counsel's objections to these comments. The defendant argues that the prosecutor's remarks improperly accused defense counsel of urging the jury to violate the law.

Construed in context, the prosecutor's remarks were unobjectionable. Defense counsel had already argued to the jury that the defendant would be spared from the death sentence if only one juror refused to sign the verdicts finding the defendant eligible for the death penalty. Proof of the defendant's eligibility for the death penalty was overwhelming, and defense counsel's argument was simply an appeal to the jury to ignore the evidence in the case and to refuse to find the defendant eligible for the death penalty. We believe that the prosecutor's rebuttal argument, in the context in which it occurred, was a fair reply to defense counsel's own impassioned appeal.

The defendant also challenges the constitutionality of one of the statutory aggravating circumstances used in this case to establish the defendant's eligibility for the death penalty. Section 9—1(b)(7) of the Criminal Code of 1961 authorizes the imposition of the death penalty if "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7). One of the victims in the present case, Anthony Coleman, was nine years old at the time of his death.

The defendant argues that the preceding provision is unconstitutionally vague. See *Maynard v. Cartwright*, 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988).

In our earlier opinion in this case, however, we upheld the validity of this aggravating circumstance against an identical challenge. Although at that time this court determined that the defendant's guilty plea was invalid and vacated the defendant's convictions and sentences and remanded the cause for further proceedings, the court also addressed several challenges raised by the defendant that were likely to arise on retrial, including the defendant's challenge to the validity of section 9—1(b)(7). *People v. Kidd*, 129 Ill. 2d 432, 454-56 (1989). That determination became the law of the case, and we will not disturb it here. We note that the jury in the present case received instructions defining the terms "brutal" and "heinous."

Finally, if any doubt should remain concerning the validity of the aggravating circumstance used in this case, with the special instructions defining the relevant terms, we would observe that two other statutory aggravating circumstances independently supported the jury's eligibility finding, in addition to the circumstance being challenged here. In the present case, the jury also found the defendant eligible for the death penalty on the ground that he murdered more than one person, and on the ground that he committed a felony during the course of one murder. Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(b)(3), (b)(6). The jury returned separate findings on each aggravating circumstance, and therefore the alleged invalidity of this third aggravating circumstance would not have affected the determination that the defendant was eligible for the death penalty. The defendant does not contend that any infirmity in the provision found in section 9—1(b)(7) would have spilled over into the second stage of the sentencing hearing.

C

The defendant also contends that the trial judge erred in refusing jury instructions tendered by defense

counsel regarding certain nonstatutory mitigating circumstances at the conclusion of the second stage of the death penalty. Counsel wanted the jurors to be specifically instructed that mitigating circumstances included, among other things, the defendant's mental retardation, his abusive home life, and his deprived childhood. The trial judge refused the tendered instructions.

We agree with the State that no error occurred in the trial judge's refusal of the instructions submitted by defense counsel. The jurors were told, pursuant to the pattern instructions, that mitigating factors included "[a]ny other reason supported by the evidence why the defendant should not be sentenced to death." Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992). The jurors were thus apprised that they were to consider any relevant circumstance in making their decision, and we find no error in the trial judge's refusal of the proffered instructions. This court has previously rejected efforts to define the term "mitigating factor" (*People v. Gilliam*, 172 Ill. 2d 484, 520 (1996)), or, as in this case, to specify nonstatutory mitigation at the second stage of the death penalty hearing (*People v. Gosier*, 145 Ill. 2d 127, 159-60 (1991); *People v. Spreitzer*, 123 Ill. 2d 1, 40-41 (1988); *People v. Stewart*, 104 Ill. 2d 463, 492-93 (1984); *People v. Free*, 94 Ill. 2d 378, 419-20 (1983)).

### D

The defendant next raises a series of arguments regarding the prosecution's conduct at the second stage of the capital sentencing hearing. The defendant first challenges portions of the prosecution's closing argument. The defendant contends that the prosecutor improperly told the jurors that if they did not vote in favor of imposing the death penalty in this case, they would have abrogated their oaths. After referring to the defense evidence regarding the impact of the death of the defendant's father on the defendant, the prosecutor

said, "That's the excuse that they want to utilize for you to abrogate your oath." The trial judge sustained the defendant's objection to this last comment and instructed the jury to disregard it. We believe that the trial judge's prompt action in sustaining the defendant's objection was sufficient to cure any prejudice the comment might otherwise have engendered. See *People v. Tenner*, 157 Ill. 2d 341, 384-85 (1993); *People v. Baptist*, 76 Ill. 2d 19, 30 (1979).

In addition, the defendant complains that the prosecutor told the jury that if the defendant were not sentenced to death, he would pose a threat to everyone in the penitentiary. The defendant argues that these comments violated *People v. Hooper*, 133 Ill. 2d 469, 500 (1989). *Hooper*, however, only forbids comments that are not based on the evidence. We believe that the evidence in this case supported the prosecutor's argument that the defendant would pose a threat to others if he received a sentence of imprisonment. For evidence in aggravation, the State presented extensive testimony detailing the defendant's prior infractions in jail and in prison. These involved numerous altercations with other inmates and with correctional personnel, as well as threats made by the defendant against others. Because there was evidence of the defendant's prior misconduct while incarcerated, we believe that it was proper for the State to argue that the defendant would be a threat to others if he did not receive the death penalty. See *People v. Bounds*, 171 Ill. 2d 1, 66 (1995); *People v. Johnson*, 146 Ill. 2d 109, 148-49 (1991); see also *Simmons v. South Carolina*, 512 U.S. 154, 165 n.5, 129 L. Ed. 2d 133, 143 n.5, 114 S. Ct. 2187, 2194 n.5 (1994) ("Of course, the fact that a defendant is parole ineligible does not prevent the State from arguing that the defendant poses a future danger. The State is free to argue that the defendant will pose a danger to others in prison and that execut-

ing him is the only means of eliminating the threat to the safety of other inmates or prison staff").

The defendant next complains that the prosecution invited the jury to vindicate the victims for the crimes committed against them, and that the prosecution misstated the law applicable to the defendant's mitigating evidence. The prosecutor argued, "Anthony Coleman is dead and someone has to speak for him. Question you have to decide with respect to the law isn't whether there are any mitigating factors—." Defense counsel interposed an objection, and the trial judge reserved ruling on the objection; the prosecutor went on to say that the question the jury had to decide was whether the evidence in mitigation was sufficient to preclude a sentence of death; the trial judge overruled defense counsel's objection to this last comment. It was an accurate statement of law, and we find no error in the judge's ruling.

The defendant also complains of a statement in which the prosecutor said, "[The defendant] deserves four death sentences, one for Ricardo, one for Renee, one for Michelle, and however many you can conceive of for Anthony." Defense counsel did not object to this last comment, and therefore we consider his argument waived. In any event, we do not believe that the remark would have caused the jury to ignore its instructions or to disregard the evidence in the case.

The defendant also objects to comments by the prosecutor disputing the mitigating nature of the evidence introduced by the defense, which included testimony describing the defendant's mental retardation, organic brain disorder, epilepsy, and deprived and abused childhood. We find no error here. Our cases have held that the State is not required to agree with the defendant that the evidence presented by the defense in mitigation is actually mitigating. *People v. Cole*, 172 Ill. 2d 85, 112 (1996); *People v. Page*, 155 Ill. 2d 232, 277-80

(1993); *People v. Bean*, 137 Ill. 2d 65, 124-27 (1990); see also *People v. Henderson*, 142 Ill. 2d 258, 335-41 (1990) (trial judge's failure to view defendant's evidence as mitigating). As the Supreme Court noted in *Penry v. Lynaugh*, 492 U.S. 302, 324, 106 L. Ed. 2d 256, 281, 109 S. Ct. 2934, 2949 (1989), "Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."

The defendant raises a final series of arguments challenging the prosecution's actions at the second stage of the sentencing hearing. First, the defendant complains of conduct by the prosecutor during the cross-examination of Dr. Savarese. The defendant complains that the prosecutor screamed questions at the witness and, in asking the witness about his evaluation of the defendant, referred to the defendant on one occasion as a "jerk" and on another occasion as "Mr. Mentally Retarded." The trial judge sustained defense counsel's objections to the comments, and instructed the prosecutor to stop screaming at the witness. We believe that these curative steps were sufficient to forestall any prejudice.

The defendant raises several further challenges to the prosecutor's closing argument at the sentencing hearing. The defendant cites the prosecutor's comment that the defendant was "supposedly retarded," the prosecutor's reference to Dr. Wetzel as "Miss One Hundred and Fifty Dollars an Opinion," and his comment on that witness' failure to conduct further tests of the defendant's brain functioning. In addition, the defendant objects to the prosecutor's characterization of the defense efforts as "pathetic" and his statement that he would feel like Pinocchio if he were making the defendant's arguments. We believe that three of these

comments, to which the trial judge overruled objections, were proper. The "pathetic" appellation was apparently directed at defense counsel's argument that sparing the defendant from the death penalty would stop "the killing" and would put an end to the defendant's celebrity status. Arguing that the defendant was supposedly retarded was not a misstatement of the evidence; whether the defendant was mentally retarded was disputed at trial. Finally, the State could properly comment on Dr. Wetzel's failure to order further tests that might have provided further confirmation of her diagnosis of the defendant's mental condition. Her failure to do so had been the subject of extensive cross-examination.

We do not consider here the two remaining comments raised by the defendant. Defense counsel made no objection to the prosecutor's reference to Dr. Wetzel, and her hourly rate, as "Miss One Hundred and Fifty Dollars an Opinion," and therefore the defendant has waived any objection. *People v. Franklin*, 135 Ill. 2d 78, 100 (1990). Finally, the trial judge sustained defense counsel's objection to the prosecutor's comparison of defense counsel to Pinocchio ("If I had to stand up here and give the arguments they gave I would feel like Pinocchio"), and we believe that the judge's ruling was sufficient to cure the error. *People v. Harris*, 132 Ill. 2d 366, 386 (1989).

Although we have found no reversible error in the arguments of the two assistant State's Attorneys, Timothy Joyce and David O'Connor, either at trial or at sentencing, we do not intend to suggest by our ruling that we approve of all the remarks challenged here. Indeed, prosecutors violate the trust reposed in them by the public when they risk reversal of an otherwise proper conviction or death sentence for unprofessional conduct of this nature.

E

As a final matter, the defendant raises a number of constitutional challenges to the Illinois death penalty statute, section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1). Our court has considered and rejected the same arguments many times in the past, and the defendant offers no new grounds that would compel a different result here.

Our cases have determined that the statute is not unconstitutionally vague for permitting the sentencer to consider "any" aggravating circumstance supported by the evidence (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(c), (e)) in deciding whether to impose the death penalty. *People v. Cole*, 172 Ill. 2d 85, 114 (1996); *People v. Taylor*, 166 Ill. 2d 414, 439 (1995); *People v. Young*, 128 Ill. 2d 1, 59 (1989). This court has ruled that the statute does not place a burden of proof on the defense that effectively precludes the sentencing authority from giving meaningful consideration to a defendant's mitigating evidence. *People v. Page*, 155 Ill. 2d 232, 283 (1993); *People v. Strickland*, 154 Ill. 2d 489, 539 (1992); *People v. Hampton*, 147 Ill. 2d 71, 116-17 (1992).

Our cases have held that the statute is not invalid for the discretion it gives the prosecutor in deciding whether to seek the death penalty in a particular case. *People v. Lewis*, 88 Ill. 2d 129, 146 (1981); *People ex rel. Carey v. Cousins*, 77 Ill. 2d 531, 534-43 (1979); see also *Silagy v. Peters*, 905 F.2d 986, 993-94 (7th Cir. 1990). This court has previously rejected the contention that various features of the death penalty statute invite the arbitrary and capricious imposition of that sentence. *People v. Harris*, 164 Ill. 2d 322, 352 (1994); *People v. Page*, 155 Ill. 2d 232, 284-85 (1993); *People v. Pitsonbarger*, 142 Ill. 2d 353, 409 (1990). Our court has determined that the death penalty statute is not invalid for failing to require the jury to make a separate determination that death is the appropriate punishment in

the case. *People v. Whitehead,* 116 Ill. 2d 425, 462 (1987); *People v. Montgomery,* 112 Ill. 2d 517, 534 (1986); *People v. Stewart,* 105 Ill. 2d 22, 76-77 (1984).

The court has also held that the statute does not place on the defendant the risk of nonpersuasion at the sentencing hearing (*People v. Fields,* 135 Ill. 2d 18, 76 (1990); *People v. Orange,* 121 Ill. 2d 364, 390 (1988); *People v. Caballero,* 102 Ill. 2d 23, 49 (1984)), and thus a defendant is not denied a fair sentencing hearing when the prosecution is permitted to present rebuttal argument at the second stage of the hearing (*People v. Tenner,* 157 Ill. 2d 341, 382 (1993); *People v. Page,* 155 Ill. 2d 232, 282-83 (1993); *People v. Ramirez,* 98 Ill. 2d 439, 468-69 (1983); *People v. Williams,* 97 Ill. 2d 252, 302-03 (1983)). Finally, the court has found that the death penalty statute provides sufficient information gathering procedures to insure adequate appellate review of death sentences. *People v. King,* 109 Ill. 2d 514, 550-51 (1986); *People v. Albanese,* 104 Ill. 2d 504, 541-42 (1984).

\* \* \*

For the reasons stated, the judgment of the circuit court of Cook County is affirmed in part and reversed in part. The clerk of this court is directed to enter an order setting Tuesday, March 11, 1997, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed in part
and reversed in part.*

JUSTICE McMORROW, specially concurring:

Although I join in the majority's decision to affirm defendant's conviction and sentence, I write separately because I believe that the prosecutorial misconduct in the case at bar should be strongly condemned by this court. There is no justification for prosecutors, who are officers of the court, to conduct a campaign of invective against a defendant, defense counsel, and witnesses who testify on behalf of the defendant.

Most of the conduct and remarks challenged by defendant occurred either during the closing argument at the guilt/innocence phase of trial or during the capital sentencing proceedings. The record indicates that during the guilt/innocence phase of trial, one of the prosecutors made repeated suggestions in his closing argument that defendant and his counsel were lying or not to be believed. The prosecutor informed the jury that one of the imperfections of the criminal justice system was that defense "attorneys can stand up here and argue to you that those lies stand as proof of [defendant's] innocence." The prosecutor's personal opinion regarding the veracity of defense counsel and flaws in the adversarial system of justice was unjustifiable, and had the potential to improperly influence the decision of the jury.

The most egregious conduct and remarks occurred during the capital sentencing proceedings, where one of the prosecutors at times argued with defense witnesses, using sarcasm and name calling. The record indicates that the prosecutor, during his cross-examination of Dr. Savarese, *screamed* questions at the witness and referred to defendant as "a jerk" and "Mr. Mentally Retarded." The prosecutor's denigration of the defense continued throughout his summation to the jury, during which he called Dr. Wetzel "Miss One Hundred and Fifty Dollars an Opinion."

Capital sentencing proceedings impose upon the jury the serious duty of determining whether or not a defendant is eligible for and deserving of the death penalty, the most severe and irreversible state-sanctioned punishment available. The risk that a prosecutor's improper remarks may inflame the jury is an important concern for reviewing courts as well as trial courts.

In the case at bar, the trial court sustained defense objections to some of the objectionable remarks, which the majority concludes cured any prejudice that might otherwise have occurred. Although a new trial is not always a necessary sanction for improper remarks of the prosecutor, prosecutorial behavior which repeatedly exceeds the bounds of zealous advocacy debases the proceedings and creates an unnecessary diversion from the evidence and the law.

It is significant that in addition to the degrading name calling and screaming that the prosecutors in the instant case engaged in, they also implied that the jurors would be *violating their oaths* if they returned a verdict other than death. This misstatement of the law cannot be lightly glossed over as inadvertent or insignificant. In my opinion, merely holding that any error was cured by the trial court's sustaining the defense objection to the remark does not adequately dispose of the issue. Unless the trial and reviewing courts rebuke such egregious misconduct, there is little incentive in future cases for others to refrain from improper jibes, sarcasm, and outright distortions of the law. No matter how deplorable the crime in issue or how inadequate the defense theories may be perceived by the prosecution, the larger policies of fair trial and proper courtroom decorum inveigh against the type of prosecutorial remarks and conduct that occurred here. Such behavior benefits no one, not the people of Illinois who are represented by the prosecutor, not the victim's families, and certainly

not the individuals whose sole transgression was to give testimony on behalf of the defense.

In my opinion, the conduct described herein borders on constituting reversible error. For these reasons, I write separately to emphasize my strong disapproval of the prosecutorial remarks in the instant case and to caution lawyers and judges to vigorously guard against such unprofessional conduct.

JUSTICE FREEMAN joins in this special concurrence.

JUSTICE HARRISON, dissenting:

There is no dispute that at the time of trial and sentencing, defendant was taking the medication Dilantin under medical direction. For the reasons set forth in my special concurrence in *People v. Britz*, 174 Ill. 2d 163 (1996), he was therefore entitled to a fitness hearing under section 104—21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21(a) (West 1992)). By its express terms, the version of the statute in effect here applies to any defendant who is taking medication under medical direction even where, as here, the medication is not psychotropic in nature. No principle of statutory construction supports a contrary conclusion.

In filing this dissent today, I am departing from my usual policy. When my colleagues and I disagree on a legal point, such as the construction of a statute, I normally write separately only in the first case that presents the issue. Once the court has issued its opinion on the disputed point, I consider it to be the law of the state, which I am thereafter obligated to apply even if I personally disagree with it. In this case, however, *stare decisis* must yield to more fundamental concerns. I simply cannot abide an interpretation of the law that deviates as wildly from settled principles of statutory construction as does the majority's where, as here, a hu-

man being's life is at stake. When the government distorts the law to justify the execution of a defendant, its moral authority is lost and I will not be a party to it. I was elected to this office to be a judge, not a vigilante.

The judgment of the circuit court should be reversed and the cause should be remanded in accordance with *People v. Brandon*, 162 Ill. 2d 450 (1994). Accordingly, I dissent.