NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200502-U

NO. 4-20-0502

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 8, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| IAN S. KEYS, | ) | No. 20CF403 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: By declining, after a preliminary inquiry, to appoint substitute counsel to litigate the defendant's *pro se* posttrial claim of ineffective assistance, the circuit court did not commit a manifest error.

¶ 2    In the Champaign County circuit court, a jury found the defendant, Ian S. Keys, guilty of domestic battery with a prior domestic battery conviction (720 ILCS 5/12-3.2(a)(1) (West 2020)). The court sentenced him to imprisonment for 68 months. Keys appeals because the court declined to appoint a substitute defense counsel to litigate Keys's *pro se* claim that his defense counsel had rendered ineffective assistance. We are unconvinced that the court's decision not to appoint a substitute defense counsel was manifestly erroneous. Therefore, we affirm the judgment.

¶ 3                                I. BACKGROUND

¶ 4    The evidence in the jury trial tended to show the following.

¶ 5       Keys lived with Megan Ingerson, age 19, in Penfield, Illinois. They were in a romantic relationship. On September 12, 2019, Keys accused Ingerson of cheating on him. He shoved her. Consequently, in Champaign County case No. 19-CF-1325, he was convicted of domestic battery.

¶ 6       On April 16, 2020, Keys again accused Ingerson of cheating on him. This time, he threw her onto the bed of their residence and started hitting her. She was pregnant. He choked her and demanded that she enter the password to her Snapchat account on her cell phone. She squirmed free and rolled off the bed and onto the floor. He kicked her in the side and on the legs about 10 to 20 times. Also, he beat her on the back with a broom handle. She sustained bruises all over her body.

¶ 7       Keys took Ingerson's cell phone, and she stayed with him in the house for four days. She had nowhere else to go. Around 6:30 or 7 a.m. on April 20, 2020, a Champaign County deputy sheriff, whose name Ingerson did not know, came to the house. Someone—Ingerson did not know who it was—had called the police. As the police officer questioned Ingerson, Keys was standing next to Ingerson on the porch. Ingerson testified that, out of fear that Keys would beat her again as soon as the police officer left, she falsely told the police officer that nothing had happened. She lied by telling the police officer that she had fallen down the stairs.

¶ 8       By the time the police officer left, Ingerson's mother (who appears to be unnamed in the record) had arrived at the house. Ingerson's mother supposedly was going to take her to work. This was a ruse. Instead, they went to the emergency room of the hospital to make sure that Ingerson and the baby she was carrying were all right. In the hospital, a Champaign County deputy sheriff, Ted Nemecz, took photographs of Ingerson's bruises.

¶ 9        The photographs are in the record. Because Ingerson is fair-skinned, the bruises show up vividly in the photographs. There are large purple and mocha-colored bruises on her arms, waist, and legs. There is a bruise on her knee. There are brownish-yellow bruises on her face.

¶ 10        On the basis of the testimony of Ingerson and Nemecz and the exhibits, including the photographs, the jury found Keys guilty of domestic battery.

¶ 11        The hearing on September 30, 2020, began with Keys's being arraigned on two new charges. Count I alleged that on July 9, 2020, he obstructed justice by "[telling] Megan Ingerson, the named victim in case number 20-CF-403, not to come to court or to cooperate with the prosecution." Count II alleged that, on the same date, Keys committed the offense of unlawful communication with a witness in that Keys or someone for whose conduct he was legally responsible, with the intent to dissuade Ingerson from testifying fully and truthfully in case No. 20-CF-403, offered money to Ingerson—specifically, he "had someone contact her and offer to help pay for her childcare expenses."

¶ 12        After explaining to Keys the new charges and the range of penalties, the circuit court heard arguments on a motion for a new trial that defense counsel had filed. The court denied the motion.

¶ 13        Before proceeding to sentencing, the circuit court noted that, around the beginning of the month, Keys sent a letter to the court in which he criticized the performance of his defense counsel, Daniel G. Taylor. The court urged Keys to explain specifically what Taylor had done wrong or what he had failed to do.

¶ 14        Keys complained that, in the jury trial, Taylor failed to call two impeachment witnesses: (1) Keys's "cousin" Traveon Keys and (2) Keys's "friend" Shaelyn Garrett. (We are using quotation marks to signify that those were Keys's descriptions of Traveon and Garrett.)

Traveon, Keys explained, had "got[ten] messages between him and Ingerson saying that [Keys] never did nothing to her." Keys did not know the date of the message from Ingerson to Traveon, but the message was to the effect of, " 'Oh, well they put charges on [Keys] that nobody even told them about. He didn't put his hands on me.' " Ingerson had "told the same thing to" Garrett.

¶ 15 The circuit court asked Taylor if he wished to respond to those allegations. Taylor responded that he had spoken with Traveon that morning. Taylor continued:

> "Essentially, he had a screenshot. There's a text—it's a Facebook Messenger conversation where she asks how much Mr. Keys'[s] bond is and his cousin replies 200. And then she says, 'He's got to wait until my cousin gets off work because the money's in Champaign.' Basically, he's trying to arrange to bond him out. And then she says, 'They put charges on him that no one even told him about and he didn't even put his hands on me.'

> And then we asked Traveon about that. He said the text message was shortly after [Keys's] arrest, which kind of makes sense if she's inquiring to bond him out.

> And then he also said [Ingerson] was telling people she didn't turn him in and she didn't tell the police that she did this, but she's acting like she didn't want to cooperate with [Keys's] prosecution.

> Traveon said he believed she was just telling people what they wanted to hear, which I think—I mean, I've prosecuted and defended domestic batteries my entire career, both times. And I—the problem with a lot of domestic violence victims is they tell everybody what they wanted to hear."

Taylor added that he had spoken with Traveon on the phone on a previous occasion—he did not remember when he had done so—"[b]ut when [Taylor] did speak to him, he didn't really mention

- 4 -

anything about text messages that first time. And even if he did, [Taylor] would have assumed that *** this girl [was] just telling everybody *** what they want[ed] to hear."

¶ 16 As for Garrett, "the problem with her [was] that" on April 26 or 27, 2021, the police went to Ingerson's new address and Ingerson "was saying that Shaelyn Garrett had actually been contacting her, trying to get her down to the courthouse I think to sign an affidavit or something like that." Taylor continued:

> "So it seems—opening that can of worms there, too, you know, starts getting—opening up the can of worms about that could potentially lead to other situations, too, for Mr. Keys, as probably ended up here. But, I mean, I don't—I didn't see the value of that—of that."

Not only was Garrett "tainted" in that way, but it was late when Taylor first learned of her. Keys first told Taylor about Garrett on August 19, 2020, less than a week before the jury trial, and "getting a continuance would [have] allow[ed] [the prosecutor] a chance to shore up his case." Taylor had been worried that if given a little more time, the prosecutor might succeed (where he had failed before) in getting propensity evidence admitted pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2020)):

> "Specifically, his motion for propensity, there was a paragraph which the Court denied regarding some incidents that happened in between the November incident and the April incident which would have given [the prosecutor] a chance to actually shore up that and make it a legitimate paragraph and a legitimate propensity allegation, which the Court could potentially have granted."

¶ 17 Keys rejoined:

"This man is a liar, sir. This the same man that just told me a couple of weeks ago, 'It ain't my job to prove you innocent.' This man literally told me it wasn't his job to prove me innocent."

The circuit court did not see how Taylor had lied. "Mr. Taylor is correct," the court explained to Keys, "it's not his job to prove you innocent. It's his job to represent you and try to stop the State from proving you guilty." Keys had named two witnesses, and Taylor had "explained his efforts to talk to them and why he did not call them, ultimately." The court summed up: "Court has had exchange of information with the Defendant and defense counsel. And I do not find that the claims rise to the level of a probable ineffective assistance of counsel that would merit the appointment of separate counsel to pursue."

¶ 18 The circuit court then proceeded to the matter of sentencing. After hearing testimony, the court imposed a prison term of 68 months. The court afterward denied a motion to reduce the sentence.

¶ 19 This appeal followed.

¶ 20 II. ANALYSIS

¶ 21 If, after a trial, a defendant makes a *pro se* claim that defense counsel rendered ineffective assistance, the circuit court is supposed to inquire into the factual basis of the claim (*People v. Jackson*, 2020 IL 124112, ¶ 97)—as the circuit court did in this case. If the claim "lacks merit or pertains only to matters of trial strategy," the court need not appoint substitute counsel. *Id.* If, on the other hand, the inquiry uncovers a "possible neglect of the case," the court should appoint substitute counsel to litigate the allegations of ineffective assistance. *Id.* The supreme court describes our standard of review as follows: "[I]f the trial court has properly conducted [an] inquiry and has reached a determination on the merits of the defendant's [allegations of ineffective

- 6 -

assistance], we will reverse only if the trial court's action was manifestly erroneous. [Citations.] Manifest error is error that is clearly evident, plain, and indisputable." *Id.*

¶ 22    Keys argues that he showed a possible neglect of the case and that the circuit court's refusal to appoint substitute counsel was, therefore, manifestly erroneous. The difficulty with this argument is twofold. First, "[i]f the matters raised in a defendant's *pro se* motion clearly lack merit or merely pertain to matters of trial strategy, the trial court may dispose of the motion without having appointed a new attorney to assist the defendant in the presentation of those claims." *People v. Kidd*, 175 Ill. 2d 1, 44-45 (1996). Second, "[w]hether to call certain witnesses and whether to present an alibi defense are matters of trial strategy, generally reserved to the discretion of trial counsel." *Id.* at 45.

¶ 23    The present case comes squarely within the language of *Kidd*. Taylor had a strategic decision to make. He could rely merely on the undisputed fact that Ingerson had told the police officer that nothing happened. Taylor could make the argument that, despite the presence of Keys on the porch, this statement by Ingerson to the police officer was uninfluenced and uncoerced because it was well known that the perpetrator would be arrested immediately if a visibly bruised family member accused the perpetrator. Alternatively, Taylor could supplement Ingerson's statement to the police.

¶ 24    At the time, Traveon did not appear to be a supplemental source of impeachment. According to Taylor, Traveon originally never mentioned to him the text message he had received from Ingerson. If Taylor's account of his second conversation with Traveon was to be believed, Traveon regarded the text message as false, an instance of Ingerson's telling people what they wanted to hear. Therefore, arguably—if that was indeed Traveon's assessment—it is believable that Traveon saw no necessity or justification, earlier on, of bringing the text message to Taylor's

attention. Evidently, he was not inclined to pass on what he regarded as disinformation (and, by the way, in Taylor's telling, Traveon does not come across as sympathetic to Keys).

¶ 25 As for Garrett, "tainted" was a fair description. There was a danger that she could be perceived as an extension of Keys. Her lobbying of Ingerson for an "affidavit" of retraction could have made Keys look even worse, as a stereotypical abuser trying, through his friend Garrett, to manipulate his victim.

¶ 26 In short, Taylor's decision not to call either Traveon or Garrett falls into the category of strategy, which is off-limits to second-guessing. See *id.* Hence, we are unconvinced that by declining to appoint substitute counsel, the circuit court committed a clearly evident, plain, and indisputable error. See *id.*

¶ 27 III. CONCLUSION

¶ 28 For the foregoing reasons, we affirm the circuit court's judgment.

¶ 29 Affirmed.